IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint Petition of | ) ) ) | No. 39087-0-III |
| ZACHARY STEVEN SKONE. | ) ) | PUBLISHED OPINION |
| Petitioner. | ) ) | |

FEARING, C.J. —

*Reliance on racial or ethnic bias has no place in the justice system. . . . Appeals to bias not only cause personal harm and undermine the integrity of the judicial system, they distort the deliberative process. "[E]ven the simplest racial cues can trigger implicit biases . . . [that] affect . . . decision-making more so than even explicit references to race."*

*. . . .*

*The distortive power of racial bias applies to all human decision-making processes. Regardless of whether such bias has been injected into "a jury's decision-making or a defendant's participation in plea bargaining, a verdict affected by racism violates fundamental concepts of fairness and equal justice under law." In order to eradicate the pernicious impact of racism on our justice system, claims of race-based prosecutorial misconduct must be subjected to a heightened standard of review "to ensure there is no constitutional violation."*

*. . . .*

*All members of the legal community—law enforcement, attorneys, and judges—bear responsibility for addressing racial inequities in our*

> *justice system.* State v. Horntvedt, *noted at 539 P.3d 869 2023 WL
> 8592780, at \*5-7 (2023) (citations omitted) (punctuation altered).*

The Washington Supreme Court in the last half decade has emphasized the imperative of eradicating intentional, unintentional, conscious, unconscious, institutional, noninstitutional, systemic, and isolated racism from the Washington justice system. *State v. Bagby*, 200 Wn.2d 777, 794, 522 P.3d 982 (2023) (plurality opinion); *Henderson v. Thompson*, 200 Wn.2d 417, 432, 518 P.3d 1011 (2022), *cert. denied*, 143 S. Ct 242, 216 L. Ed. 2d 1276 (2023); *State v. Zamora*, 199 Wn.2d 698, 714, 512 P.3d 512 (2022); *State v. Berhe*, 193 Wn.2d 647, 444 P.3d 1172 (2018); GR 37; Open Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1 (June 4, 2020), http://www.courts.wa.gov/content/publicUpload/ Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%200604 20.pdf. The pending case asks us to determine if racism influenced a prosecution, and, if so, whether we should afford a remedy in a collateral attack. This pendant petition also prompts this court to ascertain the extent to which Washington courts will take steps to remove systemic and protracted racial injustice from the legal system.

In a personal restraint petition, Zachary Skone seeks to reverse four convictions stemming from one trial because the prosecuting attorney purportedly introduced ethnic bias into voir dire. He relies on the Washington Supreme Court's recent decision in *State v. Zamora*, 199 Wn.2d 698 (2022), wherein the prosecutor asked similar voir dire questions regarding border security. Skone's petition presents three questions, increasing

in difficulty. First, whether the voir dire questioning, despite being tempered from *State v. Zamora*, amounted to prosecutorial misconduct? Second, whether a non-Latinx Caucasian may benefit from rules precluding insertion of ethnic bias at trial? Third, what, if any prejudice must a personal restraint petitioner show when ethnic bias infects a prosecution? Because the prosecutor elicited the same irrelevant border security concerns during voir dire as educed in *Zamora*, because the prosecutor also added other irrelevant questions that inserted racially polarizing themes, because the State pursued a sentence aggravator based on Skone purportedly seeking membership in a Latino gang, and because a restraint petition should be granted when racism interferes in a fair trial, we grant the petition, vacate the convictions, and remand for a new trial.

## FACTS

Most of Zachary Skone's convictions arose from his shooting of Dane Alexander on January 14, 2018. As part of the prosecution, the State sought to show that non-Latinx Caucasian Skone was either a member of the Norteños, a criminal street gang typically associated with Mexican-Americans, or he sought to be a member. The State also alleged that the shooting was gang-related. Although Skone's personal restraint petition focuses on the content of voir dire, we must view the voir dire in the context of the underlying facts of Skone's conduct and, in particular, his participation in Hispanic gang activity.

We take the facts from trial testimony. We begin with some background of petitioner Zachary Skone and shooting victim Dane Alexander.

At trial, Zachary Skone testified to being robbed at gunpoint twice by individuals other than Dane Alexander. According to Skone, his sister had been raped by a son of a member of the Sureños, and Skone had threatened to assault the rapist. Sureños is a rival gang to Norteños. After the threat, members of the Sureños gang warned Skone not to harm the son of the gang member or else the gang would "take action." 1 RP at1289 Skone considered the warning as a threat to kill or seriously maim him. He thereafter carried a gun.

We move to Dane Alexander's background. During 2017-18, the time frame of the alleged crime, Alexander often was "under the influence of heavy medications." 1 Report of Proceedings (1 RP) at 689. According to Alexander's girlfriend at the time, Madisen Ditto, Alexander frequently smoked marijuana. At trial, Alexander agreed to memory problems as the result of abusing drugs.

By January 2018, Dane Alexander had unlawfully sold drugs for two years. During these years, Alexander's sole income came from drug dealing. At trial, Alexander first declared that he could not count the number of drug deals in which he participated. Later, he testified that he had sold drugs on at least one hundred occasions. Also at trial, Alexander conceded that he had lied to a defense investigator when he told the investigator he had only sold drugs two times.

Dane Alexander owned many guns. Alexander loves guns and took a rifle everywhere. At trial, Alexander conceded that he often showed others his rifle such that

4

the community knew he routinely carried a gun. Alexander did not sell drugs without handling a gun. Alexander owed many individuals money.

Zachary Skone met Dane Alexander at a party and agreed to sell the latter a three and one-half gram bag of marijuana. The two later met at a restaurant for the delivery of the marijuana. Skone charged $20 for that number of grams, but Alexander lacked money to pay that day. So, the two agreed that Alexander would later pay Skone $30. At the time of the marijuana delivery, Skone saw a pistol fall from Alexander's waistband. Skone knew of Alexander's reputation in the community of carrying a gun and knew that Alexander had robbed a seller of marijuana at gunpoint. Skone knew Alexander to participate in gang activity.

Zachary Skone attempted to collect the debt owed by Dane Alexander. According to Alexander, Skone sent him more than one Facebook message, in which Skone accused Alexander of owing Skone money for marijuana. At trial, Alexander, despite the Facebook messages, denied ever meeting Skone, let alone buying marijuana from him.

During trial, the State played, for the jury, interviews conducted by Grant County Sheriff Detective Aaron Hintz of Zachary Skone on January 15 and January 16, 2018, respectively one day and two days after the shooting. We first quote some of the January 15 interview, which focused on Skone's relationship to the Norteños gang and the events leading to the shooting.

> SKONE: No, I was at a different friend's house.
> [DETECTIVE] HINTZ: Okay, who's that?

SKONE: Uhh . . . I'd rather not say. I just don't . . . cuz I don't know what he's all into, cuz I know he's in a gang and stuff, so I don't know what all he's—

HINTZ: Okay. It's not illegal to be in a gang, right?

SKONE: His name is Si[n]. That's what we call him.

HINTZ: Okay. [W]hat's his first name?

SKONE: I literally don't know. . . . [L]ike when you start hanging around 'em [gangs] or whatever, they don't give you their real names.

HINTZ: Right.

SKONE: They give you their nicknames and I'm not, not that close with them.

HINTZ: Right.

SKONE: And so, I just know 'em by their nicknames.

HINTZ: What do you they call you?

SKONE: Wigga.

. . . .

SKONE: I'll go by N-word.

HINTZ: I am familiar with the term, I've heard it many times before.

So is that kind of like a term of endearment or is that just the name they've given you?

SKONE: That's just like the nickname that they gave me.

HINTZ: Okay.

. . . .

SKONE: But the gang thing is more of a Hispanic deal.

HINTZ: Oh yeah.

SKONE: And so, I guess how it came up was I'm like one of their only white friends, so they just wanted to call me wigga.

HINTZ: Right.

Clerk's Papers (CP) at 64-66 (some alterations in original). "Wigga" is slang for

"white nig***."

The January 15 interview later continued:

HINTZ: . . . Okay, so what gang is Si[n] in?

SKONE: Umm, I'm not sure. He just wears red [the color of the gang, Norteños].

HINTZ: Okay. And you're wearing all red today?

SKONE: This is my cougar shirt, so.

6

HINTZ: Some people say it's just a cougar shirt, some people say it's—

SKONE: I'm not in a gang. I'll tell you that right now.

HINTZ: Do you have any Sureño friends?

SKONE: I don't, honestly.

HINTZ: You ever have problems with Sureños?

SKONE: Huh uh. I was actually, the second time I was in jail in Chelan County, I was locked up with some Sureños.

HINTZ: Uh huh.

SKONE: But I mean, I honestly, I know they're saying how they [presumably Sureños and Norteños] like to kill each other. I mean they all seem like they're good people, I don't understand why they can't just be like the ways they were, originated, like they were the real gangsters weren't killing each other. They were doing other stuff.

. . . .

SKONE: . . . I was like okay, and then the one that I recognized, started mouthing off, too, and I was like you're____, cuz she was wearing all red.

HINTZ: Uh huh.

SKONE: I know Chance is a Southsider [Sureños]. And I was like "You're a Southside?" Like why, like I know you have cousins that are Bloods and you're wearing red, that just don't make . . . it don't mix, you know, you're hanging out with three different types of gangs.

CP at 67-69.

HINTZ: So why are you hanging out with drug dealers and gang members and loaning them your vehicle on ____?

SKONE: Because I feel comfortable, the reason why I'm around Gabe and around those guys is because something happened with my sister and she was raped by someone from Othello and I made a stupid mistake and was going . . . I basically threatened to beat him up and his dad is one, some ____ from Othello and saying that they were coming after me, basically. And that they were going to ____ "take care of me" and so, that kind of . . . basically made me shit my pants. And so, I basically being scared for my life, I wanted to build a relationship with these kinds of guys, with people that are in that same type of . . . same type of world that are . . . I mean these guys are completely ruthless. Gang members, they don't . . . they don't care about anything. I mean it's just crazy, like—

HINTZ: They do care about them, they care about themselves.

7

> SKONE: Well, yeah, that's about it though. And they don't care if they go to jail for fifteen years or—
>
> HINTZ: Uh huh.
>
> SKONE: —for killing someone. Or twenty years or thirty years. They don't care if they go . . . into a federal penitentiary and travel the country for several years because they got caught selling firearms or stuff like that.
>
> . . . .
>
> SKONE: I guess, yeah, I don't know. I guess that's my answer to why I hang around with them because I was scared. Because I threatened the wrong person because he . . . he harmed my sister, my little sister that I dearly love.

CP at 94-95.

Trial testimony covered the shooting of Dane Alexander and events leading to the January 14, 2018 shooting. Three witnesses testified to percipient observations of events surrounding the shooting: Dane Alexander, Madisen Ditto, and Zachary Skone. We outline testimony of all three witnesses.

According to Zachary Skone, on the evening of January 14, 2018, his friend, Gabriel (Gabe) Ruiz-Balderas, invited him to socialize with friends at the Eastlake Villa Apartments in Moses Lake. Skone drove his father's white pickup truck to the apartments. After Skone arrived, Ruiz-Balderas explained to Skone that he planned to journey to Moses Lake's Montlake Park boat launch to purchase "prescription-grade cough syrup of codeine and promethazine," a recreational drug beverage called "lean," from Dane Alexander. 1 RP at 1284-85. Ruiz-Balderas explained that he feared Alexander and he wanted accompaniment to protect him. Skone drove Ruiz-Balderas to the boat launch in Skone's father's truck, arriving around 7:30 at night. According to

Skone, he and Ruiz-Balderas did not intend to rob or shoot Alexander. Nevertheless, Skone carried a gun for his protection.

On arriving at the boat launch, Zachary Skone, at Gabe Ruiz-Balderas' suggestion, exited the truck and hid behind nearby bushes. Skone and Ruiz-Balderas arrived at the park ten minutes before Dane Alexander and Madisen Ditto appeared. Skone and Ruiz-Balderas knew that, if Alexander saw Skone accompanying Ruiz-Balderas, Alexander would not sell the syrup.

According to Madisen Ditto, Dane Alexander's girlfriend, Alexander drove to Montlake Park in her Jeep Commander. Ditto accompanied him in the passenger seat. Alexander brought a rifle. According to Alexander, he also placed in his pocket an ersatz plastic gun that looked real. According to the girlfriend, Alexander was high from marijuana the evening of January 14.

From the bushes, Zachary Skone watched Dane Alexander exit the Jeep with cough syrup bottles. Madisen Ditto remained in the Jeep. A street lamp illuminated Skone's view. Skone saw Alexander hand Gabe Ruiz-Balderas cough syrup bottles. Ruiz-Balderas examined the bottles. The bottles lacked the protective plastic seal around the top, which suggested tampering with the bottles. Ruiz-Balderas opened one bottle and lifted the bottle to his nose.

According to Dane Alexander's girlfriend, Madisen Ditto, Alexander had purchased the cough syrup from Walmart and the syrup was nonprescription strength.

Alexander conceded at trial that he intended to cheat Ruiz-Balderas. He further admitted to cheating other purchasers by selling counterfeit drugs.

According to Zachary Skone, as Gabe Ruiz-Balderas opened a bottle of cough syrup, Skone noticed Dane Alexander reach into his pocket, retrieve a gun, and aim the weapon at Ruiz-Balderas. Skone feared for the life of his friend. Skone stepped out from behind the bushes. He removed a .22 magnum revolver from his hoodie pocket, aimed the weapon at Alexander, and told Alexander not to "fucking move." 1 RP at 1298. Alexander moved.

According to Zachary Skone, Dane Alexander aimed his gun at him. Skone thought that Alexander would shoot him, and he feared for his life. Skone fired six bullets at Alexander.

Dane Alexander testified at trial that Gabe Ruiz-Balderas asked to see the medication. When he handed Ruiz-Balderas the bottle, Alexander heard motion in the bushes either to his right or behind him. Alexander moved his head and saw the silhouette of a person. Alexander denied pulling any gun from his person. According to Alexander, a male voice in the bushes yelled: "'Don't fucking move.'" 1 RP at 613-14. Alexander turned and ran to the back of the pickup. He saw a muzzle flash, heard shots, and hid behind the truck. He felt no bullet. When Alexander stepped toward the jeep, his leg went numb and he knelt on one leg. He heard a male voice exclaim: "'Let's get the fuck out of here.'" 1 RP at 618. The pickup truck peeled away.

10

Madisen Ditto, who remained in the passenger side of the Jeep, testified at trial that a person suddenly jumped from the bushes and that Dane Alexander turned to face the person. The person yelled "'don't fucking move'" and fired his gun. 1 RP at 467. Ditto denies that Alexander pulled a gun.

During cross-examination, Madisen Ditto agreed that the bed of Zachary Skone's pickup obstructed her view of Dane Alexander and Gabe Ruiz-Balderas. Her Jeep Commander had tinted windows. She could only see the top of her boyfriend and "could barely see" Ruiz-Balderas. 1 RP at 505. In short, Ditto agreed she could not see what transpired. She was playing on her phone at the time of the interaction between the three men.

Dane Alexander pulled himself into Madisen Ditto's jeep. Alexander suffered life threatening injuries from the gunshot wounds, but did not die.

Madisen Ditto and Dane Alexander drove to the hospital. During the trip, Ditto removed Alexander's jacket and hoodie. Officers later searched the jacket and found the plastic replica gun therein. According to Moses Lake Police Department Detective Brian Jones, one could not distinguish between the counterfeit gun and a real gun.

On January 16, 2018, two days after the shooting, Detective Aaron Hintz interrogated Zachary Skone again. During the interview Skone commented about the shooting and events after the January 14 shooting. He admitted to being present during the shooting, but accused Gabe Ruiz-Balderas of shooting Dane Alexander, although

11

Ruiz-Balderas shot in self-defense. This second interview also covered Skone's

relationship to a Hispanic gang, despite Skone being non-Latinx.

SKONE: Okay. Um, it was, uh, I, uh, I was there, but I wasn't the one shooting. It was Gabe that had the gun. . . . [S]o he [Dane] messaged Gabe Sunday and said, do you need any weed? Which is, uh, the street name for promethazine and codeine. And, Gabe said, yeah, sure. And, when I got back from snowmobiling and helping my dad, uh, Gabe messaged me and told me to go to, uh, Sin's house, and to meet him there, and that we were gonna go meet up with Dane, or, well, he didn't say Dane's name yet, but he just told me we're gonna go meet up with someone to go get promethazine and codeine. I was like, okay, cool, you know. No big deal. And, then after I got there, he proceeded to tell me that it was Dane. And, so I told him that you're going by yourself. Tell Dane that you're going by yourself and let me hide in the bush. And, I will, um, uh, come up behind him and, um, ask him what happened with my money.

. . . .

SKONE: So, I, I was freaked out personally [after the shooting]. I've never, I mean, I've seen a dead body once. . . . And, uh, we went back to Sin's house and, um, . . . after we got to Sin's house we told, uh, well, he told, I . . . what he would call his homies, it's the guys that have more stripes. . . .

. . . .

SKONE: Gabe told, um, I guess, I don't know how to say it, guys that are higher up on the . . .

HINTZ: Uh-huh (affirmative).

SKONE: . . . in the rankings.

HINTZ: I know.

SKONE: Because I'm not sure if you know how it works, 'cuz they gotta . . .

HINTZ: I know.

SKONE: . . . let, let 'em know about what happened and stuff like that.

. . . .

HINTZ: Who's his big homies?

SKONE: Um, uh, S . . . Speedy and, um, Sin are the ones that he told.

. . . .

HINTZ: Uh-huh (affirmative). Okay. And, what did Gabe do with the gun?

12

SKONE: Uh, (clears throat), he kept it (coughs), he kept it with him. Um, Sin and Speedy were tryin' to get me to take it back to Warden, to take it to, um, this guy name, um, Los, Los's house.

HINTZ: Los?

SKONE: Yeah, because he cleans guns.

CP at 129-34.

SKONE: . . . I'm kinda the bad influence on 'em and I don't get to hang around 'em. And, so this is kinda my means of, I guess, having friends for once.

HINTZ: Uh-huh (affirmative).

SKONE: But, they aren't really friends in the end.

HINTZ: Right. Remember I told you yesterday, right, I knew that you were shunned by these type of people in Warden, 'cuz you didn't fit in their clique because you weren't Hispanic, but the people in Moses Lake, you know, let white people in their gangs. Remember that?

SKONE: Uh-huh (affirmative).

HINTZ: So, what's the next step?

SKONE: (Sighs), . . . I'm not for sure, I don't know how it all works, but I mean, it's, I'm sure within' the next couple weeks or, or the next couple days or I don't know how long, but they said, give it a month or so and I would have been jumped in.

CP at 139 (alterations in original). We assume the phrase "jumped in" means granted membership in the gang.

The January 16 interview continued:

HINTZ: Okay.

SKONE: So, I would assumin' by February.

. . . .

HIINTZ: Okay. So, you said, you, you rattled off some names, but you had their pistols and when you were at Dutch Bros.

SKONE: Uh-huh (affirmative).

HINTZ: Who's, who was that again? You said, Tiny.

SKONE: Tiny is, um, Gabe, obviously.

HINTZ: Right.

SKONE: And, Speedy, I only know his first name, Angel. Um, Little Man, I don't know his name at all. He's like one of the head guys

13

and pretty much like when I asked for his name, they said you've gotta be on some gang shit to know his name.

. . . .

SKONE: So, there's Tiny, Speedy, Little Man and the Heat, and he's from here and Ephrata.

. . . .

HINTZ: Okay. What's Heat look like?

SKONE: Uh, he's, he's a big dude. He's probably about as big as I am. He's probably got about, he probably weighs about like two-fifty, two-sixty.

. . . .

HINTZ: And, how about Little's, what's he look like?

SKONE: Um, short, but really big. He's probably like five-six, weighs probably around two-thirty. I mean, his arms are probably the size of my fuckin' head.

HINTZ: Is he Hispanic?

SKONE: Yeah, they're all Hispanic except for, um, Whetto and Heat.

CP at 139-42.

SKONE: Um, it w . . . it's the, the judge, the Colt, the Colt .45.

HINTZ: Okay.

SKONE: It shoots sl . . .

HINTZ: Yeah, uh-huh (affirmative).

SKONE: . . . the buck shots too. That one's stolen for sure. I know that.

HINTZ: Okay. How do you know that?

SKONE: Um, 'cuz they told me, um, they let me in on the mission that they were doing, um, they just told me about it that they were going somewhere, um, to go steal some guns. Basically, they told me that it was like, I wanna say, like, um, maybe a week and a half ago there was a meeting at, um, that house on Hill Avenue and basically, I had to keep post and stand outside and they told me to watch for cops or scraps or . . .

HINTZ: Uh-huh (affirmative).

SKONE: . . . in other words, Sureños, um, and that, uh, after the meeting was over, they told me whether, I as [sic] like, are you guys gonna be good? Do you need any help? They're like, no, we're just gonna go get some guns real quick and we'll be back.

. . . .

14

HINTZ: Okay. So, where are they keepin' all their dope?

SKONE: I, I . . .

HINTZ: Who, who, who's . . .

SKONE: . . . haven't been let in, uh, are you talkin' dope like meth and heroin or . . .

HINTZ: Uh-huh (affirmative).

SKONE: . . . I haven't been let in on any of that.

CP at 147-49 (some alterations in original).

SKONE: Um, this guy named Little Ricky, I, I don't know. All I know is Li . . . um, all I know it's Little Ricky because, um, Heat, the guy who's taking me under his wing . . .

HINTZ: Uh-huh (affirmative).

SKONE: . . . wanted me to go, quote unquote, put in work and show him that I can stand up for myself and . . .

HINTZ: Uh-huh (affirmative).

SKONE: . . . basically, go beat this guy up to get him jumped out.

HINTZ: Okay. You're supposed to beat up Little Ricky?

SKONE: Uh-huh (affirmative).

HINTZ: So, Heat's kinda your mentor?

SKONE: Yeah, he is.

. . . .

HINTZ: Who's doin' all the shootings?

SKONE: Uh, it's been several people. I mean, obviously, the one you're investigating now.

HINTZ: Uh-huh (affirmative).

SKONE: Um, I don't know anything about the one on Saturday, um, all I know is it was Norteños. I don't know who exactly.

. . . .

HINTZ: So, the day of, when you were at Dutch Bros?

SKONE: Yeah. Um, all I know is that s . . . some Southsiders [Sureños] were going to, um, Listo's house and they showed up and they were driving really slow and then so, everyone that was at that house, and I believe, um, it was, uh, Speedy, Heat, Little Man and Listo, um, they all came outside and then they said that the scrap, the Southsiders, um, tried backin' up their car and they, uh, hit a pole or something, I don't know what happened, 'cuz they posted on their Snap Chat, Speedy posted on his Snap Chat story, Scraps tried catchin' us slippin', ended up wreckin' their shit.

HINTZ: (Chuckles), okay.

15

. . . .

SKONE: Um, and they hit, uh, or messaged Gabe and we're the base and well, it end . . . it ended up being Sureños and, um, they tried basically . . . robbing us, holding us at gunpoint. Said, give me all your money.

CP at 158-64 (some alterations in original).

By the time of trial, Zachary Skone agreed that he, not Gabe Ruiz-Balderas, had fired the shots at Dane Alexander, but claimed that he shot in defense of Ruiz-Balderas and himself.

At the time of the shooting, Kayla Gosvenor was the girlfriend of Zachary Skone. On January 20, 2018, six days after the shooting, Gosvenor and Skone spoke by telephone. Gosvenor informed Skone that some of Gosvenor's friends expressed concern about the condition of Dane Alexander. Skone responded to Gosvenor: "Fuck that nigga, he owes me three racks." 1 RP at 1428. "Racks" is slang for dollars. 1 RP at 1429. When cross-examined at trial with this comment, Skone repeated his protest that Alexander pulled a gun on him.

## PROCEDURE

The State of Washington charged Zachary Skone with one count of first degree assault with a firearm enhancement, one count of first degree robbery with a firearm enhancement, two counts of first degree unlawful possession of a firearm, and one count of attempting to bribe a witness. The State sought, with regard to the assault and robbery charges, a sentence aggravator on the theory that Skone committed the crimes to obtain or advance his position in the Norteños gang.

16

During pretrial proceedings, the trial court spoke with counsel for both parties regarding their intentions on asking potential jurors questions about illegal immigration during voir dire. We recite the conversation:

THE COURT: . . . I know in a trial that my colleague did, there was an issue about immigration, and one side may or may not have objected to certain questions about immigration, and so I just want to see what are the topics potentially, because I want there to be a discussion ahead of time before we get into that. So it doesn't sound like too many questions about immigration from the state.

MR. DANO [prosecuting attorney]: Well, I don't know. It may be. Why is that—why is that verboten in your eyes?

THE COURT: Because as I understand it, this case doesn't involve an[y] issues with immigration.

MR. DANO: We've got the Norteños and the Sureños gangs, and I'm not talking about immigration, but I may ask them about border security, what they think about that, that's a big topic of today. I may ask a question about that generally just to find out their feeling, without getting into specifics about immigration. But I may ask them that question. And I don't think there's a problem with that.

THE COURT: Mr. Kentner [defense counsel], is there any issues with those questions?

MR. KENTNER: Well, it's an interesting discussion, but I guess I need to understand the relevance associated with Moses Lake and the allegations. I mean I guess I need to understand the connection. I'm asking questions, I know the state's trying to ask questions in terms of eliciting how people feel about particular issues related to this case. The last case we had before your Honor, Mr. Dano had talked about borders and illegal immigrants, it may have been relevant, in terms of I think the guy was charged with—my client was charged with illegal—unlawful possession by an alien. That may have been relevant. But in this particular case, I don't know if that's relevant.

MR. DANO: I don't really plan on talking about getting into "illegal immigration," but I do plan to ask about their general feelings about border security, if they are a person that feels—feels that they've—that there's some—it's a big topic right now in the country.

See the problem we have is you can't get jurors to talk, Bob, typically you can't get them to talk about things. And so that's something that I know everybody—a lot of people have very strong feelings about,

17

one way or the other. And I'd just ask them a question if they could make room for—or which side of that argument they feel like they're closer to. We have too little border security, we have too much border security, just to get them to talk about things.

I think that's a very useful question, because it's just the same as law enforcement, if you feel there's too—there's too much law enforcement or too little law enforcement, or there's—that would be another question too. I think it ties in. I don't think there's anything improper about it. I'm not suggesting anything about Mr. Skone's status.

The one thing, though, in this case is they are going to hear about gangs and gang violence, involving two Mexican gangs, or the Norteños and the Sureños. So it is relevant. But I don't plan on going on a big deal about it. I just want to find out what people's general feeling is about that and get them to hopefully have a discussion and find out where they are about that and tie that in with law enforcement and with gang violence. I just kind of have thoughts about that to hopefully get a discussion going.

THE COURT: Mr. Kentner, any comments?

MR. KENTNER: No, Your Honor. I've stated my comments. I don't know if that's going to assist in terms of facilitating communications about the issues in this case. But then I'll defer to the court beyond that.

THE COURT: So I think just the general questions about law enforcement, border security, you know, arguably that helps one side or the other get an insight as to their feelings about law enforcement or what not. So I think those questions are okay.

I guess the question about "illegal immigration," I think that's a little bit more questionable. In particular, because we have these rules of evidence, ER 413 that specifically talks about not introducing anything about immigration as evidence in court unless one party files a motion ahead of time and identifies why it's relevant in that particular case. And so when we stray into issues about immigration when we have a case that has nothing to do with immigration, then that's where I'd say, well, it's not really relevant to talk about "illegal immigration." So that would be a topic area, how is that relevant in this case, and it likely should not be discussed during voir dire.

So again, general topics about just security, law enforcement, I don't see that as being an issue. But when we start using charged terms, especially in this day and age with immigration and illegal immigration, when the case does not involve those issues, I'd say those are topic areas that we probably would stay away from, basically.

MR. DANO: So I just want to make sure I'm on the same page, we're on the same page. A lot of people express to me, Judge, like as an

example, not so much maybe Norteños and Sureño gangs locally, although that is big topic of conversation that I have with people in the community from time to time, but there's something that's reported on a lot is the MS 13 gang that's in the United States, and the reporting about that being a lot of those individuals are illegal. So I don't plan on getting into that with them. Just simply what their opinions are about this issue on border security, are they closer to the side that says, we don't have enough, or we have too much and don't need a wall, that kind of thing. See what they say about that. That's what I was intending to do.

1 RP at 69-74.

The Grant County prosecuting attorney began voir dire:

MR. DANO: . . . So the first question, just a general question. Some people say—some people say right now in our society that there's—a general question, that's what this question is, that we—a big topic of conversation going on in the country is border security. And I'm doing this to try to get a discussion going. Some people believe that we have not enough border security, need more, need more, a wall built, need more people on the border to protect our border. Some people are of the mind that we have more than enough, and that we've got plenty, that that's not a problem.

So I'm asking you, which—between those two positions, which one are you closer to? First of all, who believes or who feels they're closer to the position that we need more border security than we currently have? Okay. That's about half the group.

And people that are closer to the idea that we already have enough, we don't need more? Okay.

So who'd like to start it off? Juror number seven, ma'am, would you stand up, please? And could you just talk about why you feel the way you do about that?

JUROR [7]: Well, I think the main reason that I say that there's already enough is because—

. . . .

JUROR [7]: The only reason I would say that is because I already feel like or I've known that there's already a lot of money spent on that and I believe that there can be more money spent to other things that's happening in the U.S.

MR. DANO: Okay. For instance? Give me a for instance.

JUROR [7]: Like maybe the medical programs, how—like let's say someone with cancer has to pay a lot of money for chemotherapy. There could be a lot more help for them than just border security.

MR. DANO: Okay. Thank you. Thank you.

Okay. People on the other side of that, I can't remember who—put your paddles back up, that thinks we need more border security.

Number nine, yes, sir?

JUROR [9]: I think we do. There's a crisis at the border right now.

MR. DANO: Can everybody hear him?

JUROR [9]: There's a crisis at the border right now with all the numbers. Something has to curtail that, I don't know if it's border security or change of laws, but we definitely have a problem.

MR. DANO: Okay. Just a clarifying question. When you say numbers at the border, what concerns you the most about that?

JUROR [9]: The way that our camps are being overrun. We don't have enough people to manage the mass amounts of people that are coming across the border right now.

MR. DANO: Okay. And how many people heard juror number nine and agree with that? Put your paddles up, please, so I can see them.

Thank you.

How many people disagree with that? Okay. Don't be afraid now. Okay. We're going to do one thing.

Go ahead and have a seat, juror number nine.

1 RP at 270-73.

The State's attorney also inquired of juror 5 regarding her belief that the United States maintains sufficient security at the border:

MR. DANO: Just a curious question. Are you concerned at all about—about our open borders, that people are coming across the border at more than we can handle; does that concern you at all?

JUROR [5]: Not really.

MR. DANO: Tell me why.

JUROR [5]: I don't know.

MR. DANO: Okay. And it's okay. Thank you for being straight with us.

Is it something—have you really thought about it or studied it that much, is that why you're hesitant?

JUROR [5]: Not really.

> MR. DANO: You don't really pay attention to it?
> JUROR [5]: Yeah.

1 RP at 279-80.  Juror 58 offered the following response to counsel's questioning:

> I'm pretty black and white on the rules and the laws of the land. . . . [W]e're talking about border control—border wall and stuff yesterday, yeah, I was thinking, yeah, I do believe in that, but I think there needs to be some changes, how we, you know, bring immigrants into the nation, we're enabling things that are not good to happen.  Things like that.  But I'm pretty black and white on the law.  I think, you know, we have to face our consequences, yep.

1 RP at 369-70.

Immediately after juror 58's response, the prosecuting attorney asked questions invoking racial tension in the United States.

> MR. DANO: Okay.  I had one question.  I'll just use you for a second.  Something recently happened, I don't know if anybody saw this on TV or not, so Nike was going to put out a shoe that had the Betsy Ross flag, the 13 stars, the original flag of the United States on the back, and Nike pulled that, because Colin Kaepernick said, I don't know, he said, it's whatever he said, there's an endorsement issue, I don't know what his position was, except they pulled it.  So that seemed to be a pretty hot button topic for a lot of people.
> First of all, how many people saw that?  Okay.
> How many people were upset with Nike for pulling that?  Okay.  The same people.
> How many people were not upset with Nike for pulling that?  Weird.  You too?  Just kidding.  Sorry.
> Juror number two and juror number five.  Yes, Ma'am, can you tell me about why?
> Thank you, Mrs. [S], I appreciate it.  Thank you.
> Yes, juror number five.  Yes, ma'am?
> JUROR [5]: It wasn't about them pulling it, it's just their choice to do that, so they weren't in a confrontation and getting like in trouble necessarily, but didn't want a backlash from people.  They didn't want—
> MR. DANO: Who was going to backlash, who did you think it was going to affect?

JUROR [5]: I don't know.  But it probably would affect –

MR. DANO: Can you make room for the idea that a lot of people are patriotic about this country and are pretty troubled by people that are offended by the United States flag that live here and are citizens of this country?

JUROR [5]: I'm not sure.

MR. DANO: You live in this country, right?

JUROR [5]: Yes.

MR. DANO: Are you offended by the United States flag?

JUROR [5]: No.

MR. DANO: Do you think most people are not offended by the flag?

JUROR [5]: Yeah.

MR. DANO: Can you make room for the idea that Nike probably would have made more money selling that with the United States flag symbol on it because they'd have more customers that probably would have embraced that than people that said, no, I don't like that, and it's offensive to me?

JUROR [5]: Yeah.

MR. DANO: I'm sorry.

JUROR [5]: I'm so confused.

1 RP at 370-72.

Throughout trial, the State underscored that Zachary Skone was either a member of the Norteños gang or wanted to be a member.  In addition to playing the two interviews of Skone by Detective Aaron Hintz, the State offered evidence that Skone called himself "Little Wigga" and sent a text the day before the shooting in which he said "we doin a whole lotta gang shit here."  1 RP at 1318-19.

During trial, juror 5 expressed concern to the bailiff, in front of the entire jury, about gang-related retaliation against the jurors if the jury found Zachary Skone guilty. Other jurors also expressed this concern.  The trial court thereafter questioned jurors separately about their respective concern in the presence of the parties.  After speaking

22

with counsel and the jurors, the trial court determined to proceed with trial without excusing any juror.

Gabe Ruiz-Balderas did not testify at trial.

During summation, Zachary Skone's counsel described the events of January 14, 2018 at the Montlake Park boat launch as "a drug deal that went bad." 1 RP at 1644. According to Skone's attorney, Gabe Ruiz-Balderas exposed Dane Alexander as a fraud when the cough syrup bottle lacked a seal. Alexander pulled a gun on Ruiz-Balderas in order to scare Ruiz-Balderas into paying anyway. Alexander had robbed others. Skone shouted at Alexander, who then aimed the gun at Skone. Skone, fearing for his life, shot Alexander in self-defense.

The trial court instructed the jury that the State needed to disprove self-defense beyond a reasonable doubt. The self-defense instructions informed the jury that one may stand his ground and that he may act on what he honestly and reasonably perceives even if the perception is mistaken.

The jury found Zachary Skone guilty on the count of first degree assault with a deadly weapon, both counts of unlawful possession of a firearm, and the count of attempting to bribe a witness. The jury acquitted Skone on the count of first degree robbery and the sentence aggravator of committing first degree assault to gain or advance his position in a gang.

Zachary Skone appealed his convictions. On appeal, he asserted he lacked a fair trial in part because of a biased jury. According to Skone, some of the jurors discussed

23

the case before deliberations, the trial court avoided gathering information about jurors'

discussions and concerns for safety, and the court compounded the jurors' preconception

of danger by offering police escorts to their cars. Skone did not contend that the

prosecuting attorney engaged in misconduct during voir dire. In an unpublished opinion,

this court affirmed the convictions. *See State v. Skone*, No. 37147-6-III, 16 Wn. App. 2d

1069 (Wash. Ct. App. Mar.11, 2021).

## LAW AND ANALYSIS

In his personal restraint petition, Zachary Skone seeks reversal of all four

convictions because the State's prosecuting attorney purportedly committed race-based

misconduct during voir dire when questioning prospective jurors about their views on the

adequacy of security at the United States-Mexico border. He further argues that, based

on the race-based misconduct, he need not show any prejudice for this court to grant him

relief.

We belabor this majority opinion by reviewing the law controlling voir dire, the

*Skone* decision, principles governing prosecutorial misconduct, the prejudicial nature of

racial tones and overtones, and rules regulating personal restraint petitions. We end the

opinion by critiquing the dissent.

### Voir Dire Rules

We first examine the law of voir dire. In comments to the trial court, the

prosecuting attorney distinguished between border security and immigration and

indicated he would not discuss immigration. He told the court that he intended to explore venirepersons' views about border security because the topic held relevance to potential trial evidence about the Norteños and Sureños rival gangs. The trial court made a similar distinction between the topic of border security and the subject of immigration. We do not make the same differentiation between the two concepts, but consider both ideas to evoke the same provocative themes and thoughts. Juror 58, when responding to counsel's questioning, reasonably and immediately equated border control with unlawful immigrants.

CrR 6.4(b) governs voir dire in a criminal prosecution. The rule reads:

> Voir Dire. A voir dire examination shall be conducted for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges. . . . The judge and counsel may then ask the prospective jurors questions touching their qualifications to serve as jurors in the case, subject to the supervision of the court as appropriate to the facts of the case.

(Boldface omitted.) The latter sentence of the rule assumes that voir dire questioning must be relevant to the issues in the prosecution.

Voir dire is not without limitations. *Nolen v. State*, 2021 OK CR5, 485 P.3d 829, 856 (Crim. App. 2021). A trial court must preclude irrelevant questioning. *State v. Robinson*, 75 Wn.2d 230, 231, 450 P.2d 180 (1969).

In response to Zachary Skone's personal restraint petition, the State repeats its position at trial and maintains that border security bore relevance to the State's allegation that Skone wished to gain Norteños membership. We disagree. We may assume that

25

some members of the broad group of Norteños and some adherents to the large band of

Sureños are present in the United States unlawfully.  But the State presented no evidence

of any of the Norteños, with whom Skone associated, being unlawfully in America.

Contrary to the dissent's suggestion, no evidence insinuated that any of the Norteños,

with whom Skone associated, engaged in cross-border violence or drug smuggling.  In

fact, the State did not even present any evidence of any one crossing a border, of cross-

border gangs, or the smuggling of drugs.  No witness testified to the Norteños and

Sureños being international gangs or as including, in membership, unlawful residents of

the United States.  In short, border security, drug smuggling, and violence by illegal

residents bore no relationship to the charges brought against Skone.

The dissent's suggestion that border security held relevance to the trial exacerbates

the structural racism present during the prosecution's voir dire and illustrates the ease at

which a decision maker falls into a formulaic photograph of all gang members or

criminals who happen to be Latinx as cross-border smugglers and brutalist bullies.  The

dissent's suggestion also reversely demonstrates the habit of decision makers painting

unlawful residents from Mexico as drug smugglers, rapists, and killers.

The State's attorney immediately followed his voir dire questioning about border

security with questioning about Colin Kaepernick, a polarizing Black former NFL

quarterback, who "took a knee" during the national anthem.  The questioning hinted at

criticism of Nike for removing an American flag from a shoe at the request of

Kaepernick, and the voir dire invoked the American flag as patriotic.  When one of the

jurors refused to adopt the prosecution's criticism of Nike for removing the American flag from the shoe, the prosecuting attorney asked the juror if she lived in the United States. None of the issues in the case involved Colin Kaepernick, football, racial protests, athletic shoes, Nike business practices, flags, patriotism, or residency in the United States. One wonders why the State's attorney questioned the residency of a Grant County juror, and one speculates on how the questioning impacted other jurors. The questioning importuned jurors to judge the State to be on the side of patriotism and the flag, while someone who opposed the State did not belong in America. The dissent ignores the State's pandering to patriotism and insertion of polarizing racial tensions as setting the stage for the trial and the mindset of jurors.

The voir dire that began the trial of Zachary Skone echoes State conduct as reported in *State v. Loughbom*, 196 Wn.2d 64, 470 P.3d 499 (2020). The State charged Gregg Loughbom with drug trafficking. The State's attorney, during voir dire, opening statement, and summation solicited the jury to join a political, if not patriotic, war against drugs. The Supreme Court reversed the conviction because of the unfairness of saddling the defendant with the drug menace infecting the nation. Zachary Skone's prosecuting attorney sought a conviction of Skone by soliciting the jury to join a political war against a brown menace destroying our nation and in joining a patriotic war in favor of the American flag.

The trial court suggested that the prosecuting attorney could question jurors about border security because answers to the questions could reflect on a potential juror's views

27

of law enforcement officers. We consider any relationship between the two topics to be tangential. The prosecuting attorney could ask other questions to solicit a juror's views about law enforcement without inserting the irrelevant and divisive subjects of border security, refusing to stand during the national anthem, and patriotism.

We reject the dissent's lecture about deference to the trial court's overseeing of voir dire and the trial court's failure to end the voir dire as establishing that the State's attorney only asked pertinent and nonprejudicial questions. In *State v. Zamora*, 199 Wn.2d 698 (2022), the Washington Supreme Court declined to defer to the trial judge's failure to end the prosecuting attorney's voir dire.

The dissent promotes the trial court judge's elevation to the federal bench as a reason for this court to defer to the judge's refusal to preclude voir dire questioning on border security. We do not consider an ascension to the federal system to insulate a judge from error. Although the United States constitution's supremacy clause establishes federal law as the supreme law of the land that takes priority over state law, the clause does not render rulings of a state court judge immune from appellate review if the judge later transfers to the federal court.

The State assumes that trial defense counsel never objected to the State's attorney's voir dire questions on border security. We agree that defense counsel failed to clearly and directly object to such questioning. Nevertheless, we note that defense counsel told the trial court that the subject matter was not relevant to the charges in the

prosecution. We need not decide whether trial counsel's comments on relevance amounted to a sufficient objection to preserve error of prosecutorial misconduct.

State v. Zamora

The Washington Supreme Court's 2022 decision in *State v. Zamora*, 199 Wn.2d 698 (2022) dominates the outcome of Zachary Skone's personal restraint petition. *State v. Zamora* involves the same prosecuting attorney eliciting venire people's views about border security. The Supreme Court reversed Joseph Zamora's conviction based on the State's attorney's voir dire questioning. We must decide whether to apply the ruling in *Zamora* to Zachary Skone's convictions regardless of important differences between the crimes of Skone and Zamora, differences in the extent of voir dire during the two prosecutions, Skone being non-Latin, and Skone first presenting his assignment of error in a personal restraint petition.

The dissent's opening paragraph accuses the majority as looking for racism in every crevice. Perhaps we should be proud of this indictment. We assume, however, that, because of the dissent's use of pejorative words evoking child molestation and public indecency, the dissent meant no flattery. Still, a court should diligently seek to end racism wherever and whenever found. GR 37; Open Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1 (June 4, 2020), http://www.courts.wa.gov/content/publicUpload/ Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%200604 20.pdf. In this case, however, the court did not discover the racism. Zachary Skone

29

brought the racism to the court's attention. Thereafter, we devoted weeks to researching the implications of the racism to this collateral attack.

The dissent's accusation may seek to criticize the majority for purportedly finding racism when and where none exists. This indictment of the majority contributes fire rather than light to the phenomenon of systemic racism inflicting the American legal system and shows disdain for the Washington Supreme Court's call to end racism. Since the 1860s, those satisfied and benefited by the status quo have feigned concern for racism, but have then denounced those trying to end racism as seeing racism inside every nook and in every cranny.

In reviewing *State v. Zamora*, we first relate the important facts, then outline the principles of law that controlled the decision, and finally explore the differences between the prosecution of Joseph Zamora and of Zachary Skone.

The *Zamora* important facts concern voir dire. The prosecuting attorney began his voir dire questioning by introducing the subjects of border security, illegal immigration, and crimes committed by immigrants. The State's attorney mentioned 100,000 people illegally crossing the United States border each month. The attorney asked a juror whether he or she thought this nation had or did not have enough border security. Counsel asked if a juror possessed concern that someone unlawfully present in the United States might harm a family member. Many prospective jurors expressed concern about border security and illegal immigrants. The State's counsel asked some jurors if they agreed with other jurors as to the need for a border wall. The prosecuting attorney asked

jurors if they had heard of the drug bust along the Arizona border, which resulted in the confiscation of enough fentanyl to kill 65 million Americans. When one juror commented that many immigrants are great people and that United States citizens also commit crimes, the State's attorney asked the juror to consider someone complaining about the lack of border security when that person's family member had been killed by someone crossing the border unlawfully. When a second juror also expressed sympathy for undocumented immigrants, the prosecuting attorney asked her to reflect on the contrary view.

The Washington Supreme Court agreed with Joseph Zamora that the prosecutor committed race- or ethnic-based misconduct by appealing to racial bias and stereotypes during voir dire. This misconduct denied Zamora his constitutional right to an impartial jury.

The Washington Supreme Court announced and applied the following rules of law. An allegation of race-based prosecutorial misconduct requires a close and thorough examination of the record. *State v. Zamora*, 199 Wn.2d 698, 704 (2022). A claim of prosecutorial misconduct implicates the constitutional right to a fair trial. *State v. Zamora*, 199 Wn.2d 698, 708 (2022). A prosecutor violates a defendant's right to a fair trial when appealing to racial stereotypes. *State v. Zamora*, 199 Wn.2d 698, 709-10 (2022). Prosecutorial misconduct during voir dire is equally as harmful as during trial proceedings. *State v. Zamora*, 199 Wn.2d 698, 711-12 (2022). The prosecutor's remarks need not expressly reference race or ethnicity to be improper. *State v. Zamora*, 199

31

Wn.2d 698, 714 (2022). The prosecutor's intent is irrelevant because the court does not assess the attorney's subjective intent when deciding misconduct. *State v. Zamora*, 199 Wn.2d 698, 716 (2022). Inaction by defense counsel does not excuse a prosecutor's misconduct. *State v. Zamora*, 199 Wn.2d 698, 716-17 (2022). Regardless of whether the defendant objected at trial, when the defendant alleges prosecutorial misconduct implicated racial bias, the court asks whether the prosecutor "flagrantly or apparently intentionally" appealed to racial bias in a way that undermines the defendant's credibility or the presumption of innocence. *State v. Zamora*, 199 Wn.2d 698, 718 (2022). If so, the defendant need not establish prejudice. *State v. Zamora*, 199 Wn.2d 698, 721 (2022). Instead, the prejudice is incurable and requires reversal regardless of the evidence against the defendant. *State v. Zamora*, 199 Wn.2d 698, 721 (2022).

The Washington Supreme Court further wrote, in *State v. Zamora*, that, when determining whether the prosecutor's conduct "flagrantly or apparently intentionally" appealed to jurors' potential racial bias, the court asks whether an objective observer could view the prosecutor's questions and comments during voir dire as an appeal to the jury panel's potential prejudice, bias, or stereotypes. *State v. Zamora*, 199 Wn.2d 698, 717-18 (2022). The objective observer is a person who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination. *State v. Zamora*, 199 Wn.2d 698, 718 (2022). To aid in this analysis, the court considers the apparent purpose of the statements, whether the comments were based on the evidence or reasonable

inferences in the record, and the frequency of the remarks. *State v. Zamora*, 199 Wn.2d 698, 718-19 (2022). The high court presumably held that the prosecutor's conduct violated both the federal and state constitutions.

Joseph Zamora's prosecutor referred to border security ten times. During voir dire, the prosecutor repeatedly returned to the subject. Counsel implied that unlawful immigrants committed crimes that harmed American citizens. The Washington Supreme Court observed that lawful or unlawful immigration held no relevance to the prosecution of Zamora.

The Washington Supreme Court spent little time on the underlying facts behind the intercourse between Joseph Zamora and law enforcement officers. The court did not measure the strength of the State's evidence to convict. The court instead applied "the tested and proven rule of *automatic reversal*." *State v. Zamora*, 199 Wn.2d 698, 722 (2022) (emphasis added).

We posit two reasons why the Washington Supreme Court, in *State v. Zamora*, may have concluded that the prosecuting attorney's voir dire breached the right to an impartial jury and, in turn, contravened the right to a fair trial. First, by ferreting out the views of the venire members on border security, the prosecutor could better identify and choose those jurors predisposed to sympathize with law enforcement and the prosecution. Second, by referring to unlawful crossing of the United States border, the prosecutor could influence otherwise impartial jurors and rally them to vote for convictions. Perhaps the court pondered both reasons. Underlying these two rationales lies the overarching

33

conclusion that the State's attorney impermissibly targeted Mexicans or other Latinx as being unlawful, violent, and unruly entrants to the country and Joseph Zamora belonging to this Latinx collection of peoples.

We posit three reasons for the Washington Supreme Court proclaiming automatic reversal in *Zamora*. First, the Washington Supreme Court abhors ethnic bias, particularly bias inserted by the State in a criminal prosecution. Second, the court desired a prophylactic rule because past efforts to address prosecutorial misconduct had proved insufficient to deter such conduct. *State v. Zamora*, 199 Wn.2d 698, 722 (2022). Third, the court desired a practical rule because the nature of ethnic bias creates an impossibility in determining the extent to which the accused suffers prejudice. The court wrote that, with the insertion of bias and prejudice during voir dire, the jury becomes infected in untraceable ways. *State v. Zamora*, 199 Wn.2d 698, 712 (2022). Perhaps the court considered all three reasons for automatic reversal.

We assume that the Supreme Court will not automatically reverse a conviction with a slight introduction of racial bias during trial since the court listed the factors of the apparent purpose of the statements, whether the State grounded the comments on the evidence or reasonable inferences in the record, and the frequency of the remarks. This analysis would not be needed if any infection of the trial caused automatic reversal. In light of these factors, we notice some differences between the voir dire in Joseph Zamora's prosecution and the voir dire in Zachary Skone's prosecution. The principal divergence entails the State's attorney omitting, in Skone's prosecution, mention of

100,000 immigrants crossing the border each month or a large fentanyl seizure along the Arizona border.

We also observe similarities between the voir dire in both cases. In each trial, the prosecutor began the State's voir dire by immediately inserting the topic of border security. Thus, the State introduced the divisive subject matter from the beginning. In each prosecution, illegal immigration and border security lacked any relevance to the prosecution. Joseph Zamora is a United States citizen. Zachary Skone is an American citizen. No evidence suggested members of the local Norteños gang, to which Skone wished to belong, were present in the United States illegally.

In both Joseph Zamora's and Zachary Skone's trials, the prosecutor repeatedly discussed border security during voir dire. Although the State's attorney mentioned border security ten times in Zamora's trial, counsel or a juror mentioned the subject at least six times during Skone's voir dire. The discussion between the prosecuting attorney and jurors about the border wall and security consumed eleven pages of the Skone trial record. The State's attorney's questioning, during Skone's prosecution, prompted one juror to decry a "crisis" at the border. 1 RP at 272. Another juror lamented that porous borders enabled "things that are not good to happen." 1 RP at 370. These comments highlighted Latinxs being wrongly within the United States, being involved in gang activity, and causing harm to Americans. Thus, Zachary Skone began his trial with a brown letter worn on his chest. Based on *State v. Zamora*, we conclude that the

35

prosecutor apparently intentionally appealed to ethnic bias and engaged in prosecutorial misconduct.

Another difference lies between Joseph Zamora's voir dire and Zachary Skone's voir dire. The prosecution, at the Skone trial, also appealed to ethnic bias when posing irrelevant questions about Colin Kaepernick and when asking a juror whether she lived in the United States after she refused to accept the State's implied criticism of the African-American protestor, Kaepernick.

Ethnicity of Zachary Skone

Of course, Joseph Zamora being Latinx and Zachary Skone not being of Latino ethnicity functions as a critical difference between the two prosecutions. The prosecutor's comments in each prosecution implicated those of Latin descent, whose heritage Skone did not share. In *State v. Zamora*, the Washington Supreme Court emphasized that the prosecutor's remarks implicated the ethnicity of Joseph Zamora. *State v. Zamora*, 199 Wn.2d 698, 714 (2022). The parties cite no cases that analyze prosecutorial misconduct in the context of appealing to stereotypical views or bias against one ethnicity when the accused does not share that ethnicity.

We need not decide whether, in every prosecution when the prosecuting attorney employs stereotypical or harmful references to an ethnicity, the defendant may assert prosecutorial misconduct despite not being a member of the implicated ethnicity. Zachary Skone's case has the added circumstance that he wanted to be part of an ethnic gang and the voir dire targeted the members of this ethnicity. Although Skone was not

Latinx, the State submitted overwhelming evidence of Skone wanting to be part of the Norteños gang.

The State's argument and the dissent's joinder in that argument to the effect that border security constituted a permissible topic for voir dire ratifies our ruling that racism sullied the trial of Zachary Skone despite Skone lacking a Latin heritage. When the prosecuting attorney mentioned border security and the need for a wall, the attorney wanted the jurors to visualize the nation's southern border, where Mexicans and other Latinx from Central and South America cross. The voir dire promoted an "us-versus-them" attitude among jurors. The questioning raised a specter of dangerous Hispanic men who do not belong in the United States and inferred Skone to be part of this treacherous crowd. No wonder several of the jurors expressed concern for personal safety during the course of Skone's trial. This concern for security could have motivated the verdict of one or more jurors. The dissent needs to exit the highway, instead of simultaneously driving in opposite directions. The dissent cannot claim Latinx gangs and nefarious border crossings posed relevance to the case because Skone participated in a Hispanic gang but then posit that Skone may not complain about racism because he is not Latinx.

The Washington Supreme Court, in *State v. Zamora*, never qualified its ruling requiring automatic reversal for an "apparently intentional appeal" during voir dire to instances when the accused belonged to the targeted ethnicity. Sentences in the *Zamora* opinion suggest that a non-Latinx Caucasian should have standing to complain of

prosecutorial misconduct implicating ethnic bias because of the harm caused by racial bias. The court wrote that racial and ethnic bias in the judicial system fundamentally undermines the principle of equal justice and is repugnant to the concept of an impartial trial. *State v. Zamora*, 199 Wn.2d 698, 709 (2022). Theories and arguments based on racial or ethnic stereotypes are antithetical to an impartial trial. *State v. Zamora*, 199 Wn.2d 698, 709-10 (2022). With the insertion of bias and prejudice during voir dire, the jury becomes infected in untraceable ways. *State v. Zamora*, 199 Wn.2d 698, 712 (2022). Past efforts to address prosecutorial misconduct have proved insufficient to deter such conduct. *State v. Zamora* 199 Wn.2d 698, 722 (2022). Appeals by a prosecutor to racial or ethnic bias demand standards to deter such conduct. *State v. Zamora*, 199 Wn.2d 698, 721 (2022). The invasion of a trial by ethnic prejudice damages the fact and perception of the jury's role as a vital check against the wrongful exercise of power by the State. *State v. Zamora*, 199 Wn.2d 698, 711 (2022).

In some related and some unrelated contexts, a white defendant has standing to challenge a prosecutor's allegedly racially motivated use of peremptory challenges against black prospective jurors. *Campbell v. Louisiana*, 523 U.S. 392, 118 S. Ct. 1419, 140 L. Ed. 2d 551 (1998); *Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995); *United States v. Gometz*, 730 F.2d 475, 478 (7th Cir. 1984); *State v. Kalter*, 828 S.W.2d 690 (Mo. Ct. App. 1992); *Guthrie v. State*, 598 So. 2d 1013 (Ala. Crim. App. 1991). Caucasian residents have standing under the Fair Housing Act to challenge racial discrimination against African–Americans in their neighborhood. Section 812 of the Fair

Housing Act of 1968 (Act); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115, 99 S. Ct. 1601, 60 L. Ed. 2d 66 (1979); *Bailey v. Stonecrest Condominium Association*, 304 Ga. App. 484, 487, 696 S.E.2d 462 (2010). Some ordinances not only preclude discrimination based on race or ethnicity, but also on perceived race or ethnicity. Administrative Code of City of NY § 8-107; S.F. Admin. Code, § 37.10B. One suffers harm just as much if the perpetrator of racism wrongly considers him or her a member of the race or when he or she engaged in activities suggesting a wish to associate with members of the race.

In *Commonwealth v. Hackett*, 598 Pa. 350, 956 A.2d 978 (2008), a concurring author advocated for a Caucasian defendant, being tried jointly with African Americans, to possess standing to raise a claim of racial discrimination in jury selection which otherwise would pertain only to the codefendants. Relying on United States Supreme Court opinions, the writer deemed the violation to be a form of structural error that undermined the criminal proceeding's fairness as a whole. The writer joined the majority, on the Pennsylvania Supreme Court, in denying the petitioner relief because of an untimely collateral attack.

We recognize that the jury acquitted Zachary Skone of the gang sentencing aggravator. One could argue that this partial success established that the jury was not influenced by linking Skone to ethnic gangs or by voir dire questions about border security. Still *Zamora* and other Washington Supreme Court decisions teach that we should not speculate to the extent to which ethnic bias influences the jury's decisions

particularly when the prosecuting attorney introduces the subject of border security at the beginning of voir dire. Also, jurors expressed fear because of the State's insertion of gang themes during the trial.

Bias impacts everyone. *State v. Horntvedt*, noted at 539 P.3d 869, 2023 WL 8592780, at *5 (2023). Appeals to bias not only undermine the integrity of the judicial system, they distort the deliberative process. *State v. Horntvedt*, noted at 539 P.3d 869, 2023 WL 8592780, at *5 (2023). The distortive power of racial bias applies to all human decision-making processes. *State v. Horntvedt*, noted at 539 P.3d 869, 2023 WL 8592780, at *5 (2023). Thus, racial bias odiously infects a jury's deliberations. *State v. Horntvedt*, noted at 539 P.3d 869, 2023 WL 8592780, at *5 (2023). Even the simplest racial cues can trigger implicit biases that affect decision-making more so than even explicit references to race. *State v. Bagby*, 200 Wn.2d 777, 795 (2023).

We do not serve fairness when we speculate on the extent to which the specter of racism actually impacted thought processes. *State v. Horntvedt*, noted at 539 P.3d 869, 2023 WL 8592780, at *7 (2023). The impact on human behavior of an appeal to racial bias cannot be measured. *State v. Bagby*, 200 Wn.2d 777, 802-03 (2023).

Personal Restraint Petition

We arrive at the most difficult question posed by Zachary Skone's personal restraint petition. We must determine what, if any, prejudice Skone, as a petitioner, must establish by reason of the prosecution's voir dire questioning and, if some prejudice must be demonstrated, whether Skone satisfies that standard. We identify three possible

standards in order of increasing difficulty for Skone. First, this court conclusively presumes prejudice. Stated differently, Zachary Skone need not demonstrate any prejudice. Second, Skone must show an undermining of the confidence in the verdict. Third, Skone must establish that the jury likely would have acquitted him of at least one charge.

Unlike Joseph Zamora, who asserted prosecutorial misconduct on direct review, Zachary Skone did not assert an ethnic bias tainted voir dire as a ground for reversal in his appeal. Skone seeks relief through a personal restraint petition. The State logically contends that Skone must show actual and substantial prejudice from the voir dire questioning. The State further argues that, to establish actual and substantial prejudice, Skone must demonstrate that, but for the prosecutorial misconduct, the jury would have acquitted him. Skone does not address the question of prejudice. Skone also does not argue his appellate counsel performed ineffectively by failing to assert ethnic bias on appeal.

No Washington Supreme Court decision evaluates what, if any, prejudice a personal restraint petitioner must establish when asserting prosecutorial misconduct or when asserting that ethnic bias tainted his trial. We observe that the court, in *State v. Zamora*, applied an automatic reversal standard for such prosecutorial misconduct on direct review. In answering our question about the extent of prejudice needed, we first summarize some principles attended to personal restraint petitions. We then examine, in chronological order, some Washington Supreme Court decisions that address prejudice

for a personal restraint petition. We also analyze a United States Supreme Court decision lamenting racial bias within a criminal prosecution and one Court opinion that discusses prejudice in the setting of postconviction review.

Washington's personal restraint petition procedure, adopted by the Supreme Court in 1976, supersedes the former procedure of habeas corpus for postconviction relief or collateral attack of a criminal judgment and sentence. RAP 16.3(b). With the genesis of the personal restraint petition, the Supreme Court sought to achieve a unified, systematic, and expeditious procedure for postconviction relief in contrast to the haphazard habeas corpus procedure. *In re Personal Restraint Petition of Hagler*, 97 Wn.2d 818, 823 650 P.2d 1103 (1982).

RAP 16.3 to RAP 16.15 govern personal restraint petitions in noncapital cases. This court will grant relief to a petitioner if he or she is under "restraint" and the petitioner's restraint is unlawful for one or more reasons catalogued in RAP 16.4(c). RAP 16.4(a). Those reasons include:

> (2) The conviction was obtained . . . in violation of the Constitution of the United States or the Constitution or laws of the State of Washington.

RAP 16.4(c). Zachary Skone claims a violation of either the United States or the Washington constitution, if not both.

The law encourages resolution of appealable issues during the first appeal. *State v. Barberio*, 121 Wn.2d 48, 52, 846 P.2d 519 (1993). The appellate process exists to remedy trial errors even when constitutionally based. *In re Personal Restraint Petition of*

42

*Coggin*, 182 Wn.2d 115, 340 P.3d 810 (2014). Collateral review seeks to correct the most egregious errors that cause actual harm. *In re Personal Restraint Petition of Coggin*, 182 Wn.2d 115, 122 (2014).

A personal restraint petition does not substitute for a direct appeal, and different procedural rules accompany a petition from an appeal. *In re Personal Restraint Petition of Coggin*, 182 Wn.2d 115, 120, (2014); *In re Personal Restraint Petition of Myers*, 91 Wn.2d 120, 122, 587 P.2d 532 (1978). These rules limit the availability of collateral relief because the relief undermines the principles of finality of litigation, degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders. *In re Personal Restraint of St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992). Postconviction relief significantly increases the cost of the criminal justice system. *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 824 (1982). The personal restraint procedure seeks a balance between the interest in an error-free trial and pursuit of finality of judgments. *In re Personal Restraint of Haynes*, 95 Wn.2d 648, 654, 628 P.2d 809 (1981).

A petitioner who collaterally attacks his conviction must generally satisfy a higher burden than an appellant on direct review. *In re Personal Restraint of Stockwell*, 179 Wn.2d 588, 596-97, 316 P.3d 1007 (2014). To obtain relief in a restraint petition based on a constitutional error, a petitioner must show two things: (1) a constitutional error occurred and (2) the error resulted in actual and substantial prejudice. *In re Personal Restraint Petition of Coggin*, 182 Wn.2d 115, 119 (2014); *In re Personal Restraint of*

*Yates*, 180 Wn.2d 33, 40, 321 P.3d 1195 (2014); *In re Personal Restraint of St. Pierre*, 118 Wn.2d 321, 330-31 (1992). The petitioner carries the burden of proof by a preponderance of the evidence. *In re Personal Restraint of Lord*, 152 Wn.2d 182, 188, 94 P.3d 952 (2004).

No court rule or statute requires that the personal restraint petitioner show any prejudice based on a constitutional violation. Nevertheless, in one of the first decisions addressing personal restraint petitions, the Washington Supreme Court ruled that a petitioner must show prejudice from the alleged error of the trial court. *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 819 (1982). Later the court adopted the measure of "actual and substantial prejudice." *In re Personal Restraint of Speight*, 182 Wn.2d 103, 107, 340 P.3d 207 (2014). This standard diverges from the test, in direct review, that demands that the State establish beyond a reasonable doubt any constitutional error to be harmless. *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 825 (1982).

The Washington Supreme Court frames the test for a personal restraint petition with the phrase "actual and substantial" prejudice. The words "actual" and "substantial," written in the conjunctive, carry distinct meanings. Nevertheless, the Supreme Court has never analyzed the words separately. Presumably if the petitioner suffers substantial prejudice, he or she also suffers actual prejudice. In *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 825 (1982), the high court perhaps unintentionally shortened the test to a "substantial disadvantage." Sometimes, the state Supreme Court shortens the test as requiring only "actual prejudice."

44

To show actual and substantial prejudice, a petitioner must show that the outcome likely would have differed had the alleged error not occurred. *In re Personal Restraint of Davis*, 200 Wn.2d 75, 86, 514 P.3d 653 (2022); *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 825 (1982). Stated differently, when the petitioner challenges a conviction, he or she must establish that the constitutional error probably changed the result at trial. *In re Personal Restraint of Fero*, 190 Wn.2d 1, 15, 409 P.3d 214 (2018); *In re Personal Restraint of Brown*, 143 Wn.2d 431, 453, 21 P.3d 687 (2001). The court looks to the totality of the circumstances, including the weight of the evidence of guilt, which necessarily involves review of the whole record. *In re Personal Restraint of Mercer*, 108 Wn.2d 714, 720, 741 P.2d 559 (1987); *In re Personal Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985).

Sometimes the appellant accused need not show any prejudice, on direct review, when constitutional error occurred, such that the court ignores the harmless error rule. Nevertheless, errors considered per se prejudicial on direct review are not necessarily considered per se prejudicial on collateral review. *In re Personal Restraint Petition of Coggin*, 182 Wn.2d 115, 119 (2014); *In re Personal Restraint of Stockwell*, 179 Wn.2d 588, 596-97 (2014). Expressed otherwise, our Supreme Court has not adopted a categorical rule that would equate per se prejudice on collateral review with per se prejudice on direct review. *In re Personal Restraint Petition of Coggin*, 182 Wn.2d 115, 120 (2014). Perhaps contradictorily, however, the Supreme Court has recognized that, in some instances, presumed prejudicial error for purposes of an appeal will carry over to a

45

personal restraint petition. *In re Personal Restraint of St. Pierre*, 118 Wn.2d 321, 329 (1992); *In re Personal Restraint of Richardson*, 100 Wn.2d 669, 679, 675 P.2d 209 (1983). One such example is punishment for two offenses in violation of double jeopardy. *In re Personal Restraint of Borrero*, 161 Wn.2d 532, 536, 167 P.3d 1106 (2007). The Supreme Court also considers a conviction for a nonexistent crime, even when the defendant pled guilty, to automatically constitute actual and substantial prejudice. *In re Personal Restraint of Hinton*, 152 Wn.2d 853, 860, 100 P.3d 801 (2004); *In re Personal Restraint of Knight*, 4 Wn. App. 2d 248, 254, 421 P.3d 514 (2018).

In other contexts, the opposing party may present evidence and argument to rebut a legal presumption. Nevertheless, in the milieu of a personal restraint petition and in the few instances when the Supreme Court presumes prejudice, the presumption is irrefutable. Thus, presumptive prejudice is a misnomer. The Supreme Court could simply declare that under some circumstances the petitioner need not show any prejudice. The Supreme Court has referred to presumptive prejudice as per se prejudice, as a conclusive presumption, and as automatic proof of prejudice. *In re Personal Restraint of Forcha-Williams*, 200 Wn.2d 581, 600, 520 P.3d 939 (2022); *In re Personal Restraint of Stockwell*, 179 Wn.2d 588, 597-98 (2014); *In re Personal Restraint of Borrero*, 161 Wn.2d 532, 536 (2007); *In re Personal Restraint of Richardson*, 100 Wn.2d 669, 679 (1983). We will later discuss potential errors that could create a preclusive presumption in Zachary Skone's instance.

We now identify the phenomenon branded double prejudice. Under many constitutional provisions, the claimant need not show any prejudice to establish the underlying constitutional breach. In a few circumstances, however, the claimant must actually show prejudice in order to prove a substantive violation of the constitution. Stated differently, prejudice inheres as a requirement to the constitutional claim. *In re Personal Restraint of Pirtle*, 136 Wn.2d 467, 474, 965 P.2d 593 (1998). Ineffective assistance of counsel is a primary example. *In re Personal Restraint of Pirtle*, 136 Wn.2d 467, 474 (1998).

To prevail on a prosecutorial misconduct argument, the claim on which Zachary Skone relies, the defendant must establish both improper conduct by the prosecutor and prejudicial effect. *In re Personal Restraint of Pirtle*, 136 Wn.2d 467, 481-82 (1998). The accused establishes prejudice only if he shows a substantial likelihood that the conduct affected the jury's verdict. *In re Personal Restraint of Pirtle*, 136 Wn.2d 467, 481 (1998). Importantly, however, the accused need not show the jury likely would have acquitted him. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). Instead, the accused need only show a probability sufficient to undermine confidence in the outcome. *State v. Estes*, 188 Wn.2d 450, 458 (2017); *State v. Moreno*, 26 Wn. App. 2d 681, 696, 529 P.3d 431 (2023). This same rule of prejudice applies to ineffective assistance of counsel claims. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004). This lower standard for prejudice may follow from the requirement that the State must prove all elements of the crime beyond a reasonable doubt and any undermining of

confidence creates a reasonable doubt. Even an error that causes minimal prejudice could tip the scale against the jury finding guilt beyond a reasonable doubt.

The Washington Supreme Court has faced the situation when the personal restraint petitioner already proved some prejudice in order to establish the constitutional violation. The court then needed to decide whether the nature and extent of prejudice established to substantiate the constitutional violation sufficed in order to establish actual and substantial prejudice for purposes of a personal restraint petition, the question labeled double prejudice. The Washington Supreme Court initially ruled that, when a petitioner demonstrates ineffective assistance of counsel, any prejudice demonstrated to satisfy the claim acts as sufficient prejudice for collateral relief. *In re Personal Restraint of Crace*, 174 Wn.2d 835, 843, 280 P.3d 1102 (2012); *In re Personal Restraint of Harvey*, 3 Wn. App. 2d 204, 215, 415 P.3d 253 (2018). Later, however, the Supreme Court limited the carryover of prejudice for ineffective assistance to instances when the accused suffered "complete denial of counsel." *In re Personal Restraint of Davis*, 152 Wn.2d 647, 674 (2004). Complete denial of counsel includes denial of counsel at a critical stage of trial, counsel's failure to subject the prosecution's case to meaningful adversarial testing, and counsel's laboring under an actual conflict of interest. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 674 (2004).

The Supreme Court has not addressed whether the prejudice sufficient to show prosecutorial misconduct also satisfies the actual and substantial prejudice requirement for a personal restraint petition. Remember that, although *State v. Zamora* is based on

prosecutorial misconduct, the Supreme Court did not require Joseph Zamora to demonstrate prejudice. In *In re Personal Restraint of Pirtle*, 136 Wn.2d 467 (1998), the court nearly answered the question, but appears to have resolved Blake Pirtle's petition on the basis that the prosecuting attorney committed no misconduct.

We begin our review of Washington Supreme Court decisions with *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 825 (1982), wherein the state high court adopted the actual and substantial prejudice standard. Previously the state high court employed a nebulous test that weighed the interest in the finality of judgments with the interest in the petitioner having his claim heard. *In re Personal Restraint of Schellong*, 94 Wn.2d 314, 616 P.2d 1233 (1980).

In adopting the new standard of actual and substantial prejudice, the Washington Supreme Court, in *In re Personal Restraint of Hagler*, relied on the federal standard for habeas corpus petitions. The United States Supreme Court had attached an actual and substantial disadvantage test to the burden a petitioner must show. *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982). The *Hagler* court deemed such a test to be appropriate since the personal restraint petition procedure is no substitute for an appeal. The Supreme Court denied petitioners David Hagler and John Wesley Polk relief because, even if they showed instructional error, a correct instruction was immaterial under the admitted facts. The petitioners could not show that they would have been acquitted under their proposed instruction.

49

We examine Justice Robert Utter's concurring opinion in *In re Personal Restraint of Hagler* because the opinion may subconsciously impact later courts' views of prejudice. Justice Utter insisted that prejudice is not a fixed standard and should not always be applied on collateral attack. Instead, the degree of prejudice required should vary from case to case. Justice Utter quoted at length a passage, about habeas corpus review, written by Judge Henry Friendly of the United States Circuit Court of Appeals for the Second Circuit.

> The conclusion we draw from all this is that the standard of how serious the probable effect of an act or omission at a criminal trial must be in order to obtain the reversal or, where other requirements are met, the vacating of a sentence, is in some degree a function of the gravity of the act or omission; the strictness of the application of the harmless error standard seems somewhat to vary, and its reciprocal, the required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play. At one end of the range is the case where the defendant has simply, although excusably, not had the benefit of evidence that has later become available to him; there the . . . test requires a showing that the new evidence 'would probably produce a different verdict.' At the other end of the range is the case of a defendant being obliged to plead to a capital charge without benefit of counsel; there the court 'does not stop to inquire whether prejudice resulted.' Between these extremes lie the other cases we have reviewed—newly discovered evidence that a witness has recanted, or had lied (without knowledge by the prosecutor); ordinary errors in the admission or exclusion of evidence; violations of statutory commands; and infringements of other constitutional guarantees.
>
> The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that 'The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach,' and by the teaching of experience that mere admonitions are insufficient to prevent repetition of abuse. In other cases,

50

> where the conduct of the trial has been less censurable, or not censurable at all, a greater showing of prejudice is demanded, because the interest in obtaining an ideal trial, with the trier of the facts considering all admissible evidence that has ever become available, and nothing else, is not thus supplemented and may be outweighed by the interest in avoiding a retrial unlikely to have a different outcome—an interest especially weighty when, as is normally true on collateral attack, the second trial will come long after the first.

*Kyle v. United States*, 297 F.2d 507, 514 (2d Cir. 1961) (citations and footnote omitted).

In his concurring *Hagler* opinion, Justice Robert Utter advanced a standard of "less than probabilities" for a constitutional error that impacts "the truth-finding function of the jury." *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 830 (1982) (Utter, J. concurring). Concerns for finality of judgments lack force when a person might be innocent. *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 830 (1982) (Utter, J. concurring).

In *In re Personal Restraint of Richardson*, 100 Wn.2d 669 (1983), Gary Richardson challenged, in a personal restraint petition, his conviction for second degree assault on the ground that his trial counsel previously represented an important witness at trial. The witness could have substantiated Richardson's claim of self defense. Answers posed by defense counsel, however, might have implicated the witness in a crime of embezzlement with the alleged victim of the assault. When the prosecutor stopped the questioning for purposes of advising the witness of his right against self-incrimination and that he should consult counsel, the witness volunteered that Richardson's defense counsel was his lawyer. The trial court did not inquire about the relationship after

defense counsel suggested that the witness simply testify to the dislike between Richardson and the alleged victim. Defense counsel did not ask about any embezzlement.

Gary Richardson filed a personal restraint petition, in which, among other claims, he asserted ineffective assistance of counsel because of his trial counsel's failure to explore the embezzlement with the trial witness. The Supreme Court noted that the trial court erred when failing to inquire about trial counsel's potential conflict or to appoint different counsel. This error deprived Richardson of effective assistance of counsel. The court further concluded that a defendant, who shows an actual conflict of interest adversely affected his lawyer's performance, was entitled to relief without a showing of prejudice. These circumstances gave rise to "a conclusive presumption of prejudice." *In re Personal Restraint of Richardson*, 100 Wn.2d 669, 679 (1983).

*In re Personal Restraint Petition of Boone*, 103 Wn.2d 224, 691 P.2d 964 (1984) entailed revocation of probation, an instance when the Supreme Court generally does not require proof of actual and substantial prejudice because the offender earlier lacked an opportunity for judicial review. Nevertheless, the Supreme Court's analysis extended beyond probation revocations. The State contended that Douglas Boone possessed alcohol and assaulted someone in violation of his probation. Boone denied the assault. At the revocation hearing, the probation officer, unknown to Boone, delivered to the superior court a secret report that could have influenced the superior court's revocation of probation. The report recounted a conversation between the probation officer and

Boone's girlfriend, during which the girlfriend recounted assaults by Boone. Boone filed his personal restraint petition in the court of appeals three months later when he learned of the report. The court of appeals dismissed the petition because Boone had not shown he was actually prejudiced by the report. On appeal to the Supreme Court, the State contended that, even without the evidence found in the secret report, the superior court heard evidence sufficient to sustain the revocation. Thus, according to the State, Boone failed in his showing of prejudice.

In *In re Personal Restraint Petition of Boone*, the Washington Supreme Court noted the law presumed prejudice to the petitioner for some constitutional errors. Generally, those errors involve constitutional rights "basic to a fair trial." *In re Personal Restraint Petition of Boone*, 103 Wn.2d 224, 233 (1984). The secret report breached Douglas Boone's right to confrontation and effective cross-examination. Still, the court declined to base its decision on presumptive prejudice and instead found that the error worked to the actual prejudice of Boone.

*In re Personal Restraint of St. Pierre*, 118 Wn.2d 321 (1992) bears importance because of its discussion of whether the Supreme Court will ever grant a personal restraint petition without the petitioner affirmatively establishing prejudice. The State charged Christopher St. Pierre with aggravated first degree murder. Over St. Pierre's objection, the trial court instructed the jury that it could convict St. Pierre of the included offense of first degree felony murder if it did not find him guilty of aggravated first

degree murder. The jury found St. Pierre guilty of first degree felony murder. On appeal, St. Pierre did not argue instructional error.

After Christopher St. Pierre's appeal, the Supreme Court ruled, in *State v. Irizarry*, 111 Wn.2d 591, 763 P.2d 432 (1988), that first degree felony murder was not a lesser included crime for aggravated first degree murder. The Supreme Court, in *Irizarry*, also ruled the error to constitute prejudicial error. The court reversed the conviction of Ricardo Irizarry because the information failed to charge Izarry with first degree felony murder.

After the *Irizarry* decision, Christopher St. Pierre filed a personal restraint petition. In response, the Supreme Court, in *In re Personal Restraint of St. Pierre*, noted that, in the past, it had, in dicta, suggested it would presume prejudicial, for purposes of personal restraint petitions, those constitutional errors never deemed harmless on direct appeal. But the *St. Pierre* court rejected such a rule. The court declined to adopt any rule which would categorically equate per se prejudice on collateral review with per se prejudice on direct review. The court qualified its pronouncement with a recognition that, under some circumstances, some per se prejudicial errors on direct review will sometimes be per se prejudicial on collateral attack. The Supreme Court considered the error to lie in the charging document, and the court concluded that such an error was not prejudicial per se on collateral attack. St. Pierre failed to establish actual and substantial prejudice because, before *State v. Izarry*, trial courts routinely instructed juries on first degree felony murder when the State charged the defendant with aggravated first degree murder. Also, the

54

charging information listed aggravating circumstances that constituted felonies in themselves. Thus, St. Pierre was on notice that a jury might convict him of first degree felony murder.

In *In re Personal Restraint of Orange*, 152 Wn.2d 795, 814, 100 P.3d 291 (2004), Christopher Orange argued that his appellate counsel performed ineffectively when failing to raise the issue of an unconstitutional public trial closure on direct review. The court noted that, in *In re Personal Restraint of St. Pierre*, it explicitly rejected the suggestion from earlier dicta that the court would presume prejudice for purposes of a personal restraint petition those constitutional errors deemed prejudicial on direct appeal. Nevertheless, the court summarily held that it would presume prejudice in this instance because, if appellate counsel had assigned error in the appeal, Orange would have received a new trial. In any direct attack, the Supreme Court would have presumed prejudice.

*Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) addressed the relationship between between federal and Washington harmless error rules. The case does not entail postconviction relief, but presumably the same idea of Supreme Court supremacy as to the implications stemming from federal constitutional violations extends to personal restraint petitions.

A Washington State jury convicted Arturo Recuenco of assault in the second degree based on the jury's finding that he assaulted his wife with a deadly weapon. The jury finding did not specify the type of deadly weapon used. The superior court applied a

three-year firearm sentencing enhancement based on its own finding that Recuenco

pulled a gun. The trial court's finding of a fact necessary for a sentence above the

crime's statutory maximum contravened the United States Supreme Court's decision in

*Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). On

appeal to the Washington Supreme Court, the state high court vacated the sentence, while

concluding that a *Blakely* error may never be harmless, because the error violated the

accused's constitutional right to a jury. Because the jury had never found beyond a

reasonable doubt that Recuenco used a firearm, no jury verdict existed against which to

apply harmless error. In a related decision, *State v. Hughes*, 154 Wn.2d 118, 110 P.3d

192 (2005), decided the same day, the state court labeled the *Blakely* error to be

"structural error." *State v. Hughes*, 154 Wn.2d 118, 142 (2005). In so ruling, the

Washington Supreme Court relied on the federal constitution's Sixth Amendment right to

a jury, not the state constitution's analog. The United States Supreme Court accepted

review of Recuenco's sentence.

The nation's high Court, in a five-to-four split in *Washington v. Recuenco*, noted

that it rarely held an error to be structural error that required automatic reversal. The

Court impliedly defined structural error as error that "'necessarily renders a criminal trial

fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'"

*Washington v. Recuenco*, 548 U.S. 212, 218-19 (2006) (citation omitted). With scant

analysis, the Court analogized failure to submit a sentencing factor to the jury to failure to

submit an element of the crime to the jury. Such a mistake, according to the Court, did not amount to structural error.

In a footnote, the United States Supreme Court observed that, on remand, Arturo Recuenco could still argue that, as a matter of state law, the *Blakely* error could never be harmless. *Washington v. Recuenco*, 548 U.S. 212, 218, n.1 (2006). Presumably the Court meant that the Washington Supreme Court could classify the error as structural error when relying on the state constitution's provision guaranteeing a jury trial, but not employ that classification for violations under the federal constitution.

We journey forward six years to *In re Personal Restraint of Crace*, 174 Wn.2d 835 (2012), wherein the state Supreme Court again addressed the standard for assessing prejudice in a personal restraint petition based on ineffective assistance of counsel. A jury convicted Hoyt Crace of attempted second degree assault with a deadly weapon. The conviction constituted his third strike offense, resulting in a life sentence without early release. Crace's trial counsel failed to request a jury instruction on the lesser-included offense of unlawful display of a deadly weapon, a nonstrike offense. This court granted Crace his petition, while reasoning that the showing of prejudice needed to establish ineffective assistance of counsel satisfied the actual and substantial prejudice element for a personal restraint petition.

The Supreme Court, in *In re Personal Restraint of Crace*, ruled that a showing of prejudice for purposes of ineffective assistance of counsel satisfied the need to establish prejudice for a personal restraint petition. In so ruling, the high court noted that the test

57

for prejudice, under ineffective assistance of counsel principles, was a probability sufficient to undermine confidence in the outcome, not a probability of a different verdict. The State had asked the superior court to impose the higher standard of a different result in a restraint petition. The Supreme Court reasoned that *Strickland v Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), from which all courts derive the two-element test for ineffective assistance of counsel, entailed postconviction relief. In *Strickland*, the United States Supreme Court expressly rejected a standard of prejudice that would require the habeas corpus petitioner to show more likely than not that counsel's deficient conduct altered the outcome of the prosecution. The Washington Supreme Court justified applying this standard of prejudice in a personal restraint petition because ineffective counsel fails to assure a reliable and fair trial. Ineffective assistance of counsel impairs the adversarial process needed to produce just results.

Despite its rejection of a rule requiring a demonstration of a different outcome, the Evergreen Supreme Court still denied Hoyt Crace's petition on the basis that he failed to show prejudice for purposes of ineffective assistance of counsel. Sufficient evidence supported a guilty verdict for the higher crime, such that Crace showed no prejudice by reason of his counsel failing to demand a lesser-included offense instruction. In so ruling, the court breached its rule that the client need only show that deficient performance undermines confidence in the verdict. Sufficient evidence of the higher crime is immaterial.

The Supreme Court need not have addressed the question of whether prejudice sufficient to show ineffective assistance of counsel on appeal suffices for purposes of a personal restraint petition. The court could have rested its decision solely on the basis that Hoyt Crace failed to establish prejudice essential to show ineffective assistance of counsel. In a concurring opinion, Justice Wiggins wrote that the court should have waited until a later case to address the double prejudice question.

In *In re Personal Restraint of Stockwell*, 179 Wn.2d 588 (2014), Daniel Stockwell sought, by a personal restraint petition, to withdraw his guilty plea to a charge of statutory rape in the first degree. Stockwell's plea statement and his judgment and sentence misstated the statutory maximum sentence for the crime. The Supreme Court agreed with the Court of Appeals that Stockwell failed to show actual and substantial prejudice. The decision lacks importance because of the nature of the claimed error, but garners our attention because of the discussion between the majority and a minority of the court on the requirement and nature of prejudice.

Daniel Stockwell argued before the Supreme Court that he need not demonstrate prejudice because he pled guilty based on misinformation. The high court disagreed and expressly held that a personal restraint petitioner seeking to withdraw a plea based on a misstatement of the statutory maximum was required to satisfy the actual and substantial prejudice standard on collateral attack. Stockwell did not argue actual and substantial prejudice. The facts did not show prejudice because the sentencing court granted him an exceptional sentence downward.

In analyzing prejudice, the Supreme Court rejected concurring Justice Gordon McCloud's assertion that the high court, in *St. Pierre*, adopted a "one-size-fits-all" approach whereby a petitioner must support any category of error with actual and substantial prejudice and that the court will never presume prejudice. 179 Wn.2d at 596, n.3. The majority protested that *St. Pierre* only recognized that not every error per se prejudicial on direct review enjoyed per se prejudice status on collateral attack. Some errors enjoying a preclusive presumption of error may still garner this feature in a personal restraint. The court will still presume prejudice when imposing the burden of demonstrating prejudice on the petitioner would not further the goals of finality.

Concurring Justice Gordon McCloud, joined by Justice Stephens, emphasized circumstances, in which the Supreme Court had held presumptive prejudice on direct review followed into the personal restraint petition. Examples included double jeopardy, ineffective assistance of counsel, prosecutorial withholding of material exculpatory evidence, and structural error. According to the concurrence, structural error did not trigger a presumption of harm at all. Instead, such errors fundamentally undermined the adversarial process and thus defied analysis by harmless error standards. Structural errors included courtroom closure, complete lack of counsel, race discrimination in grand jury selection, and defective reasonable doubt jury instructions.

Later in the same year as *State v. Stockwell*, the Supreme Court, in *In re Personal Restraint Petition of Coggin*, 182 Wn.2d 115 (2014), addressed one of the examples given by Justice Gordon McCloud in her *Stockwell* concurring opinion. In a plurality

lead opinion, four members of the high court decided what standard of prejudice to apply to a personal restraint petition that complained about a violation of the public trial right. In each case, counsel and the trial court questioned prospective jurors in chambers without the trial court engaging in the analysis required by *State v. Bone-Club*, 128 Wn.2d 254, 906 P.3d 325 (1995). The Supreme Court readily agreed that the closed questioning violated the petitioner's public trial right. Nevertheless, the lead opinion concluded that a petitioner claiming a public trial right violation for the first time on collateral review must show actual and substantial prejudice arising from the closure. The plurality referred to this test of prejudice to be the general rule for a personal restraint petition. The lead opinion declared that it would presume prejudice only when, in light of the essential purpose of the constitutional right asserted, the violation necessarily prejudiced the defendant. The opinion listed two examples of presumed prejudice to be ineffective assistance of counsel and prosecutorial withholding of material exculpatory evidence. The plurality opinion noted that the limited trial closure did not implicate the right to a fair trial because the open courtroom rule seeks to remind officers of the court of the importance of their functions, encourage witnesses to come forward, and discourage perjury. Because of the sensitive nature of the case, the private questioning more likely benefitted William Coggin.

William Coggin's attorney requested questioning of the venire in private because the publicity and sensitive nature of the prosecution. One wonders the outcome of the personal restraint petition, if Coggin claimed ineffective assistance of counsel by reason

of requesting the closed questioning rather than directly asserting the right to a public trial or if Coggin claimed deficient performance by appellate counsel by failing to assert the public trial right violation during direct review.

In a dissenting opinion in *In re Personal Restraint Petition of Coggin*, joined by three other justices, Justice Stephens hailed the public trial right as essential to a democratic society. According to the dissenters, the court should protect the right by declaring its violation as always inherently prejudicial. The opinion labeled the violation a structural error that defied harmless error analysis. An unjustified closure tainted the entire framework in which the trial operated. A court faced an impossibility in gauging the prejudice of an unjustified closure. Closing the court during voir dire carried the same implication in denying the public access to the court proceeding as closing other portions of the trial proceeding. Justice Stephens reminded the majority that the court recently, in *State v. Morris*, held that the structural nature of the public trial right violation conclusively established prejudice. Finally, Justice Stephens noted the anomaly of granting a personal restraint petition if the petitioner claimed ineffective assistance by appellate counsel in failing to assert the public trial violation on direct review, but denying relief when the petitioner asserted the public trial right directly during the collateral attack.

In *In re Personal Restraint Petition of Meredith*, 191 Wn.2d 300, 422 P.3d 458 (2018), the Supreme Court once again addressed prejudice in the context of ineffective assistance of appellate counsel. During Gary Meredith's trial for rape of child, the

superior court granted both sides one less peremptory challenge than afforded under court rule. Defense trial counsel never objected to this error. Meredith's appellate counsel failed to raise error on appeal. In his personal restraint petition, Meredith did not directly claim error in the trial court's failure to afford the additional challenge or his trial counsel's mistake in not demanding the challenge. Instead, Meredith asserted his appellate counsel performed deficiently by failing to assign error to the mistake on appeal.

This court first entertained Gary Meredith's restraint petition and granted the request. We reasoned that any impairment of a party's right to exercise a peremptory challenge constituted reversible error without a showing of prejudice on direct review. Thus, appellate counsel performed ineffectively when failing to raise the error on appeal.

The Supreme Court rejected Gary Meredith's restraint petition on the basis that he could not show prejudice. In the context of ineffective assistance of appellate counsel, the petitioner needed to demonstrate a reasonable probability that, but for his counsel's unreasonable failure to assign error, he would have prevailed on appeal. The court highlighted that the court of appeals, when reviewing Meredith's direct attack, could have refused to hear the claim of error because of the failure of trial counsel to object. The error did not qualify as "structural error that require[d] automatic reversal." *In re Personal Restraint Petition of Meredith*, 191 Wn.2d 300, 303 (2018). The court repeated the theme that structural error occurs when the error necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

Meredith argued that the error rendered his trial fundamentally unfair because he would have exercised the additional challenge on one of three jurors. The court answered that only conjecture supported a conclusion that any of the three jurors held bias. The court repeated the examples of improper courtroom closure, despite its *Coggin* decision, complete lack of counsel, racial discrimination in grand jury selection, and double jeopardy.

*In re Personal Restraint Petition of Lewis*, 200 Wn.2d 848, 523 P.3d 760 (2023) consisted of two consolidated cases, in which an Idaho lawyer, unlicensed in the state of Washington, respectively represented two accused. In a 5 to 4 opinion, the Washington high court denied the petitioners relief. The majority based its holding on the lack of a violation of the Sixth Amendment's right to counsel on the reasoning that each defendant still enjoyed experienced and competent representation. Since the court could have rested its decision on the lack of prejudice for purposes of an ineffective assistance of counsel claim, the court need not have addressed prejudice for purposes of a personal restraint petition, but did so anyway.

Justin Lewis and Robert Ayerst argued that their lack of a licensed Washington attorney not only violated their Sixth Amendment right to the assistance of counsel but also constituted structural error for which they need not show identifiable error. Although the majority adjudged the petitioner's predicament not to consist of structural error, the majority agreed that structural error, a special category of constitutional error,

required "automatic reversal." *In re Personal Restraint Petition of Lewis*, 200 Wn.2d

848, 857 (2023). The court wrote:

> The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself. Structural errors are subject to automatic reversal; they deprive defendants of basic protections by which a trial cannot reliably function as a fair determination of guilt or innocence.

*In re Personal Restraint of Lewis*, 200 Wn.2d 848, 857-58 (2023) (citations and quotation

marks omitted). The court characterized structural errors as rare mistakes that encompass

only the most egregious constitutional violations. According to the majority, structural

error implicated the fairness of the trial. A fair trial is one wherein evidence is submitted

to adversarial testing and presented to an impartial tribunal.

We end our review of collateral attack case law with a habeas corpus petition

resolved by the United States Supreme Court because the case concerns racial equity. In

*Vasquez v. Hillery*, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986), the Warden of

San Quentin Prison appealed the circuit court of appeals decision granting Booker

Hillery's writ because a California grand jury, from which the trial court systematically

excluded members of Hillery's African-American race, indicted him for murder. The

Supreme Court affirmed the writ. When doing so, the Court refused to apply a harmless

error standard for the collateral attack. Discrimination based on the criterion of race

breached equal protection of the laws and implicated fundamental values of the American

judicial system and society as whole. The Court rejected the dissenting justices and the

warden's reasoning that, since African-Americans were not excluded from the petit jury, Hillery could prove no prejudice because a jury untainted by bias found him guilty of first degree murder. The dissenters did not wish to require the State to retry a defendant decades later for a constitutional defect that bore no relationship to the fairness of trial, particularly since witnesses might be dead and evidence destroyed. The Court majority answered that granting the writ formed the only effective remedy for the grave constitutional trespass. The Court emphasized the difficulty of assessing the impact of racial discrimination on an individual defendant's trial. The Court followed a long series of decisions that supported "a policy of *automatic reversal* in cases" of grand jury discrimination. *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986) (emphasis added). *Vasquez v. Hillery* has never been overruled.

We have painstakingly reviewed Washington decisions in order to discern how the Washington Supreme Court would wish this court to adjudge Zachary Skone's personal restraint petition. After reviewing Washington law and United States Supreme Court precedent, we conclude that Zachary Skone need not establish any prejudice because the voir dire questioning inserted ethnic bias into the proceeding and because the assigned error breached the right to an impartial and fair trial. The voir dire infected the minds of the jurors. We again recognize three reasons for the Washington Supreme Court's decision, in *State v. Zamora*, proclaiming automatic reversal: (1) abhorrence of racial bias, (2) deterrence of prosecutorial misconduct that repeats itself, and (3) the inability to assess the influence of racial bias on a jury verdict. In reaching our decision, we focus on

66

the nature of automatic reversal. We explore the relationship between a fair trial and the difficulty in measuring the impact of racism on a jury verdict.

In *State v. Zamora*, the Washington Supreme Court, on direct review, applied the standard of "automatic reversal" for prosecutorial misconduct implicating ethnic bias. In other instances, automatic reversal has carried over to conclusive prejudice in a collateral attack. The Supreme Court nowhere limited its remedy of automatic reversal to direct review. In its latest decision, *In re Personal Restraint of Lewis*, 200 Wn.2d 848 (2023), the Supreme Court equated "automatic reversal" to structural error that would permit relief in a personal restraint petition. Structural errors fundamentally undermine the adversarial process and thus defy analysis by harmless error standards.

In *Vasquez v. Hillery*, 474 U.S. 254 (1986), the United States Supreme Court followed a long series of decisions that supported "a policy of *automatic reversal* in cases" of grand jury racial discrimination. *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986) (emphasis added). The same rule should apply with added force to racism impacting the trial jury. The grand jury does not adjudge the defendant guilty or not guilty, so ethnic bias impacting the selection of the trial jury should prompt a quicker recognition of automatic reversal.

The Washington Supreme Court, not only in *State v. Zamora*, but also in *State v. Bagby*, 200 Wn.2d 777 (2023), with an error lesser in degree than in Zachary Skone's case, emphasized the need and desire to eradicate racism from Washington courts. *Henderson v. Thompson*, 200 Wn.2d 417 (2022) and *State v. Berhe*, 191 Wn.2d 1026

67

(2018) repeat this theme. According to the United States Supreme Court in *Vasquez v. Hillery*, 474 U.S. 254 (1986), the administration of justice must not only be above reproach, but also be beyond the suspicion of reproach, and a case impacted by racism misses this standard. The strong arguments by the majority against the dissent in *Vasquez v. Hillery* confirm a strong intent by the United States Supreme Court to erase racial discrimination from the judicial system.

We could either rely on the Washington Constitution's protection of an impartial jury or the federal constitution's guarantee. Although the United States Supreme Court, based on *Washington v. Recuenco*, 548 U.S. 212 (2006), may no longer recognize automatic reversal, the Court's decision in *Vasquez v. Hillery*, 474 U.S. 254 (1986), has never been overruled. In the context of a racially tainted grand jury pool, the Court majority ruled that granting of the writ of habeas corpus formed the only effective remedy for the grave constitutional trespass.

All courts recognize the right to an impartial petit jury as a constitutional right basic to a fair trial. The invasion of the jury system by racial or ethnic prejudice, at any stage of a criminal proceeding, damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State. *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 223, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017); *State v. Zamora*, 199 Wn.2d 698, 711 (2022). Courts deem the denial of the right to an impartial jury to raise presumptive prejudice. Furthermore, discrimination based on the criterion of race

breaches equal protection of the laws and implicates fundamental values of the American judicial system and society as whole.

Denial of the right to an impartial trier of fact is a classic structural error, requiring reversal without a showing of prejudice. *Chapman v. California*, 386 U.S. 18, 24-25 n.8, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). In *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927), the United States Supreme Court reversed the defendant's conviction despite clear evidence of guilt because, no matter the strength of evidence against him, he had the right to have an impartial judge.

In *In re Personal Restraint Petition of Boone*, 103 Wn.2d 224 (1984), the Washington Supreme Court noted the law presumed prejudice to the petitioner for some constitutional errors. Generally, those errors involve constitutional rights "basic to a fair trial." *In re Personal Restraint Petition of Boone*, 103 Wn.2d at 233. Justice Robert Utter's concurrence in *In re Personal Restraint of Hagler*, 97 Wn.2d 818 (1982) emphasized constitutional error that impacts "the truth-finding function of the jury." *In re Personal Restraint of Hagler*, 97 Wn.2d 818, 830 (1982) (Utter, J. concurring). In *Vasquez v. Hillery*, 474 U.S. 254 (1986), the United States Supreme Court emphasized the difficulty of assessing the impact of racial discrimination on an individual defendant's trial. The Washington Supreme Court recently held that that race-based prosecutorial misconduct can never be "'harmless error.'" *Henderson v. Thompson*, 200 Wn.2d 417, 421-22 (2022).

*State v. Zamora* suggests that infusion of ethnic stereotypes clouds the jury's judgment, or at least the ruminations of some jurors. Tainting a trial with racial stereotypes or by criticizing a racial class tends to short-circuit a decision maker's decision-making process. The juror employs a fixed, overgeneralized belief about a particular group of people based on their race, rather than engaging in an individualized assessment of guilt or innocence. The juror looks for evidence to confirm the oversimplified view. During voir dire in Zachary Skone's prosecution, the State elicited a general picture of Hispanics violating laws and committing crimes. The State amalgamated Skone with a group of brown men threatening the safety of Grant County. Fear for their safety entered jurors' psyche.

The dissent faults the majority for failing to be bound by Washington Supreme Court decisions such as *In re Personal Restraint of St. Pierre* and *Personal Restraint of Rhem*, 188 Wn.2d 321, 394 P.3d 367 (2017). We deem our conclusion consistent with those cases, but we further conclude that we have followed the recent Washington precedent of *State v. Bagby*, *Henderson v. Thompson*, *State v. Zamora*, *State v. Berhe*, and GR 37 and the earlier United States Supreme Court precedent of *Vasquez v. Hillery*. The dissent fails to analyze the recent state Supreme Court decisions and ignores the Supreme Court's pleas to end systemic racism no matter when and where found. If we have failed to follow Supreme Court precedent, we welcome Supreme Court reversal.

The State of Washington convicted Zachary Skone of more than one crime. The Washington Supreme Court, and perhaps also the United States Supreme Court, generally

70

declines to rule that a petitioner suffered sufficient prejudice for purposes of reversing one or more convictions but not for purposes of one or more other convictions. Perhaps in light of this absence of a discussion, the postconviction relief court must analyze prejudice for all convictions only in light of the conviction with the weakest evidence. More importantly, the jury could have absolved Zachary Skone on one but not all of the other convictions, but we do not know which one so we give Skone the benefit of the doubt.

We observe that, even if Zachary Skone needed to show an undermining of the confidence in the verdict or that the jury likely would have acquitted him of the charges, he might satisfy one or both of the higher standards. For this reason, we examined in detail, at the beginning of our opinion, the facts and contradictory trial testimony. Zachary Skone admitted to the shooting but provided evidence of self-defense. The State presented no undisputed evidence that contradicted Skone's defense.

Only four witnesses saw what occurred. One witness, Gabe Ruiz-Balderas, never testified. Zachary Skone testified to a plausible scenario supporting self-defense, and the trial court instructed the jury on the right to stand one's ground. The prosecuting attorney effectively cross-examined Skone as not always being truthful. But defense counsel also successfully impeached victim Dane Alexander as sometimes stretching, if not injuring, the truth. The third witness, Madisen Ditto, was the girlfriend of Alexander, who admitted to an obstructed view of the shooting.

71

The remedy for race discrimination in jury is reversal. *State v. Tesfasilasye*, 200 Wn.2d 345, 362, 581 P.3d 193 (2022); *State v. Lahman*, 17 Wn. App. 2d 925, 929, 488 P.3d 881 (2021). The remedy applies regardless of the strength of the prosecutor's case or the hardship to victims or witnesses. *State v. Lahman*, 17 Wn. App. 2d 925, 932 (2021).

## The Dissent

The dissent strays miles from the issues posed by Zachary Skone's personal restraint petition by sermonizing on the need to diminish or end the emotional trauma suffered by witnesses, jurors, judges, attorneys, and court personnel as a result of trials, if not the judicial process in its entirety. The dissent's wandering bewilders the majority for many reasons. First, the dissent presents no evidence of trauma imposed on the participants in the prosecution against Skone. Thus, the dissent's homily is overinclusive. Second, professionals employed within the judicial system may readily end such employment on suffering distress. Third, the evil attacked by the dissent, to the extent it exists, applies to all trials, not just retrials after a grant of a personal restraint petition. Thus, the dissent's discourse is underinclusive. Fourth, the law already factors into the standards for personal restraint petitions any distress imposed on participants, but no case deems this harm controlling on the outcome of the decision. Fifth, resolving the problem identified by the dissent would require a wholesale restructuring of the American legal system.

The dissent laments that a retrial of Zachary Skone will impose trauma on witnesses. The dissent impliedly extends this suffering to clerks, attorneys, jurors, and judges. Nevertheless, no evidence suggests the witnesses in this suit suffered trauma by testifying, let alone any clerk, attorney, or judge participating in the trial underwent distress as a result of assisting in the legal process. The trial judge likely suffers no long-term trauma because of his desired elevation to the privileged position of a federal judge. We recognize some jurors expressed concern for their safety, but we wonder as to the anxiety that the voir dire discussion promoted with references to unlawful immigrants crossing the southern border and committing violent crimes.

We recognize many witnesses, particularly victim witnesses, suffer distress from testifying. Still, every victim reacts to testifying differently, and some find catharsis and empowerment by testifying. RCW 7.69.030 recognizes harm imposed on victims, survivors, and witness from a criminal prosecution and grants these individuals numerous rights to alleviate suffering.

We observe that the State subpoenas and forces many victims to testify against their wishes and despite wanting the State to dismiss charges. Sometimes a prosecuting attorney admirably attempts a resolution of criminal charges by plea agreement in order to reduce the distress caused to a victim. Still a prosecuting attorney may proceed to trial against the desires of the victim. This prerogative of the prosecutor reaches its zenith in domestic violence prosecution, when a partner asks the State to dismiss charges because he or she has reconciled with the violent partner and relies financially on that partner.

73

Presumably the dissent would not order the prosecutor to dismiss such a domestic violence charge, but the dissent's reasoning would compel the dropping of charges.

Of course, any judge, attorney, or clerk encountering clinical depression because of the trial process remains free to resign from the profession. Most judges characterize the calling as the most rewarding and pleasing job during their lifetime. Although the dissent may seek to only end retrials, the dissent's rationale for doing so indicts the entire American justice system, in which attorneys present cases, witnesses testify, judges issue decisions, and juries render verdicts.

Like the State attempting, during a trial, to impose all of the evils attended to the international drug trade upon local users of narcotics, the dissent seeks to attribute the full extent of trauma suffered by all participants in the legal justice system upon the grant of a personal restraint petition. If one takes the dissent's preaching about trauma to its silly, but reasonable, conclusion, the dissent advocates for the end to any reversals of convictions because of the reversal's demand for a retrial. The dissent's concern even goes further and promotes the abolition of trials because of the psychic damage imposed on attorneys, witnesses, jurors, and court personnel. Although a retrial may add trauma, the trauma does not arise because it is a second trial. The trauma attaches to any trial.

The dissent impliedly asks that the victim and other witness not be traumatized again by a second trial. Of course, the need for a second trial would not arise if the State had not engaged in misconduct. Also, dismissal of the charges against Zachary Skone would also erase the need for the trauma of a second trial. In order to effectuate Skone's

constitutional right to an unbiased jury and a fair trial, the dissent could advocate for

dismissal of the charges, but it does not do so.

Washington decisions addressing personal restraint petitions build into their

standards and our analysis in this petition review recognizes the wish for finality in part

to protect witnesses from another trial. Washington standards for reversal of conviction

in direct review also embed concerns for finality with the harmless error rule. But

personal restraint petition law allows for a conclusive presumption of prejudice in some

circumstances. After scrutinizing Washington Supreme Court decisions, we discern that

the Supreme Court promotes the priority of ending State appeals to racism during a trial

as holding supremacy and as demanding an automatic new trial despite the possible

trauma to witnesses

The majority and the dissent agree on one thing. No decision discusses the trauma

imposed on witnesses in having to testify in court. Thus, one wonders why the dissent

raises this topic for the first time in a case marred by institutional racism. We wonder

how often, in response to the reversal of a criminal conviction, the dissent will raise the

subject matter of emotional distress caused by the judicial process. We deem the raising

of the concern to be one more excuse to stop efforts in ridding the criminal justice system

of racism. For years to come, litigants and judges will continue to forward others excuses

to thwart the promise of the Fourteenth Amendment's equal protection under the law.

We know of no rule that bars the grant of a restraint petition, let alone precludes

reversal of a conviction, because of trauma to witnesses. The Washington Supreme

Court, in *State v. Zamora*, remanded the prosecution for a new trial despite witnesses needing to testify a second time. The remedy of a new trial applies to unfairness in jury selection regardless of the strength of the prosecutor's case or the hardship to victims or witnesses. *State v. Lahman*, 17 Wn. App. 2d 925, 932 (2021).

Because the harm acknowledged by the dissent could apply to any trial, the dissent should focus its attention on extensive reformation, if not an entire restructuring, of the judicial process. The dissent should advocate for a restorative system of justice rather than an adversarial system that requires judgments of guilt and punitive measures.

The dissent itemizes a list of horribles about emotional distress suffered, and even suicides committed, as a result of court proceedings. In an appendix, we travel through the list to show its inanity for purposes of the pending petition.

## CONCLUSION

Racial justice and Washington Supreme Court precedent command that we grant Zachary Skone's personal restraint petition. We reverse and vacate his four convictions. We remand for a new trial on those charges.

_____
Fearing, C.J.

I CONCUR:

_____
Staab, J.

76

Appendix

First on the dissent's list of tragedies is Frances Andrade, a sexual assault victim, who killed herself after the first trial. https://www.theguardian.com/uk/2013/feb/10/frances-andrade-killed-herself-lying. She never testified in a second trial. We assume the dissent does not suggest that the Crown should have avoided prosecuting her attacker for fear that Andrade might commit suicide.

Paul Bynum, a defense investigator in the McMartin Pre-School molestation case, shot and killed himself after testifying to the bench during an in limine hearing, not during any second trial. www.upi.com/Archives/1987/12/11/McMartin-witness-commits-suicide/666156. Authorities refused to speculate as to why Bynum committed suicide. The highly publicized McMartin Pre-School prosecution lasted seven years but resulted in no convictions. The Los Angeles District Attorney dropped all charges in 1990. By the case's end, the prosecution was the longest and most expensive series of criminal trials in American history. The prosecution resulted from a day-care sex-abuse hysteria and a moral panic over alleged satanic ritual abuse in the 1980s. The only lesson that might be drawn from Bynum's death for purposes of Zachary Skone's restraint petition might be that the prosecuting attorney should not have filed the charges against Skone because a trial witness might have committed suicide.

In 1998, Shawn Newton, a witness to a homicide, attempted to kill himself to avoid testifying at the murder trial. https://www.nydailynews.com/2016/10/05/exclusive. The prosecution hid this information from defense counsel. The trial was not a retrial.

The lesson the dissent may wish to teach from the story is the State should not force any witness to testify against his or her wishes.

Chaz Higgs, a critical care nurse, was convicted of killing his wife, the former Nevada state controller. https://www.nbcnews.com/id/wbna19511361. Higgs attempted suicide twice. The second attempt entailed slitting his wrists, during the nighttime recess in the trial, because he thought he had already proved his innocence and wanted to join his wife in the promised land. Higgs' counsel commented to the press that the attempted suicide did not help the defense. A newspaper article reads that prosecutors expected to engage in tough questioning the following day, but the article does not assert that any anticipation by Higgs of cross-examination was the motive for the suicide attempt. Assuming the dissent asserts that the impending cross-examination contributed to the self-mutilation, we glean the moral to be that prosecuting attorneys should not engage in aggressive cross-examination of a defendant. Higgs did not seek death during any retrial.

In 2016, an Ontario juror committed suicide after the court called a mistrial because of the accused's need for an appendix removal. During trial, the Crown presented graphic photographs of a dead child scalded by boiling instant coffee. We assume the juror did not expect to be returned as a juror during any retrial. A newspaper article expressed the need for the Crown to avoid showing graphic evidence to jurors. https://nationalpost.com/news/canada/juror-suicidebrings-call-for-more-caution-in-trials-with-graphic-evidence. The article did not rail against second trials, retrials, or reversal of convictions in direct review or collateral attack.

In 2021, Toronto resident Mark Farrant complained to the press of post-traumatic stress disorder he still suffered as a result of serving as a juror seven years earlier in a murder trial. He blamed the disorder on detailed photographs from the autopsy and the crime scene. He lamented that an Ontario court rule demanded his silence about the trial such that he could not obtain therapy from his family physician. None of the reporting suggested Farrant served as a juror in a retrial. https://toronto.ctvnews.ca/toronto-juror-who-suffered-ptsd-pushes-for-changes-in-ontario-s-court-system.

The dissent inexplicably ends its stories of courtroom trauma with the story of former Yakima County Superior Court Judge Douglas Fiederspiel pacing at the edge of the Fred G. Redmond Memorial Bridge on Interstate 82. https://www.tri-cityherald.com/news/local/article21876529. Judge Fiederspiel was contemplating suicide. Judge Fiederspiel later refused to discuss the reason for contemplating ending his life, while stating: "It's a private issue I prefer not to have public." www.yakimaherald.com/news/local/judge-federspiel-assures-he-s-fit-to-serve-following-health-issues/article_3586848c-c6cd-11e8-ba34-e732b259b172. We are unable to confirm that the Yakima judge encountered distress from his work, let alone from a second trial in a criminal case.

No. 39087-0-III

FEARING, C.J. (concurrence) — The Grant County elected prosecuting attorney, who conducted the voir dire at Zachary Skone's and Joseph Zamora's trial, has been my friend for forty years. He is not a racist. He is a good man. For decades, the attorney zealously and ably represented members of minority groups, particularly Latinx who now constitute thirty-eight percent of Grant County's population, who were tort plaintiffs and criminally accused. I would have preferred to recuse myself from this petition proceeding, but judicial ethics precluded me from doing so. The proceeding illustrates how good people can extend institutionalized racism and exemplifies the need for all participants in the legal system to remain vigilant against ways, in which racism unknowingly impacts the system.

I concur

_____
Fearing, C.J.

No. 39087-0-III

COONEY, J. (dissenting) — In the quest to find racial discrimination lurking around every corner, the majority, with insouciance of Supreme Court precedent that demands a showing of prejudice, grants a white male relief intended for members of historically marginalized groups. The facts underlying this matter are underserving of such a result. My dissent highlights the vast factual and procedural differences between Zachary Skone's trial and the trial in *Zamora*,[1] challenges the majority's creation of an automatic right to reversal standard for a personal restraint petitioner who failed to show they sustained actual and substantial prejudice at trial, and exposes the majority's disregard of the impact its new standard has on trial court participants.

As a preliminary matter, if our review came by way of direct appeal or had Mr. Skone made a showing of actual and substantial prejudice, this dissent would not have been written. However, the majority's new standard of granting a personal restraint petition absent a showing of prejudice, thereby vacating convictions, "when racism interferes in a fair trial [of a white defendant]" leads to a nonsensical result. Majority at 3.

Zachary Skone was charged with first degree assault with a firearm enhancement, first degree robbery with a firearm enhancement, two counts of first degree unlawful possession of a firearm, and one count of attempting to bribe a witness. The State also alleged Mr. Skone committed first degree assault to gain or advance his position in a

---

[1] *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022).

gang. After Mr. Skone was convicted on four of the five counts, he appealed. On direct appeal, we concluded double jeopardy required the vacation of one of two first degree unlawful possession of a firearm convictions. Mr. Skone now brings this personal restraint petition (PRP), seeking a full retrial on the grounds that the prosecutor engaged in impermissible race-based misconduct during jury selection. Mr. Skone further alleges that the misconduct was so improper that he need not show actual and substantial prejudice in order to obtain relief. The majority agreed with Mr. Skone. Under the facts presented here, both Mr. Skone and the majority are incorrect.

TRIAL OF MR. SKONE VERSUS TRIAL OF MR. ZAMORA

The majority asserts, "The Washington Supreme Court's 2022 decision in *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022)[,] dominates the outcome of Zachary Skone's personal restraint petition." Majority at 28. The majority's conclusion fails for two reasons. First, Mr. Zamora's convictions were reversed on direct review, whereas Mr. Skone comes before us on a PRP. "Personal restraint petitions are not a substitute for appeals." *In re Pers. Restraint of Haverty*, 101 Wn.2d 498, 504, 681 P.2d 835 (1984). Secondly, there exists only two similarities between the cases—both were prosecuted by Garth Dano and each venire was questioned about border security.

2

No. 39087-0-III
*In re Pers. Restraint of Skone* (Dissent)


Mr. Skone's prosecution is factually and procedurally distinguishable from *Zamora*.[2]  First, and most compelling, Mr. Skone is a white male, not a member of a historically marginalized group,[3] whereas Mr. Zamora is Latino.  Secondly, the judge who presided over Mr. Skone's trial was an objective observer.[4]  Unlike *Zamora*, at the beginning of Mr. Skone's trial, former Grant County Superior Court Judge David Estudillo[5] raised, sua sponte, the scope of the State's questioning during voir dire.  Unlike Mr. Zamora, who was charged with assaulting two law enforcement officers, Mr. Skone was, admittedly, associated with the Norteños, a criminal gang commonly known to have ties to cross-border violence and drug smuggling.  In Mr. Skone's prosecution, evidence was also admitted concerning the Sureños, a rival gang that also is commonly known to engage in cross-border criminal conduct.  As our Supreme Court astutely recognized, "In some cases, race or ethnicity may be relevant or even necessary to discuss within the context of trial." *Zamora*, 199 Wn.2d at 715.

---

[2] The trials occurred two months apart.  Mr. Zamora was prosecuted in May 2019 and Mr. Skone in July 2019.

[3] In reviewing the record, it does not appear any of the witnesses or attorneys were members of a historically marginalized group.

[4] An objective observer is "'one who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State'—could view race as a factor in the verdict." *Zamora*, 199 Wn.2d at 718 (quoting *State v. Berhe*, 193 Wn.2d 647, 665, 444 P.3d 1172 (2019).

[5] Judge Estudillo was appointed by President Joseph Biden to the United States Federal Court for the Western District of Washington in September 2021.

3

In *Zamora*, the State devoted about three-quarters of its voir dire to highly inflammatory and irrelevant questions related to immigration. The State, in *Zamora*, "repeatedly asked the potential jurors about their views on unlawful immigration, border security, undocumented immigrants, and crimes committed by undocumented immigrants." *Id*. at 701. By way of comparison, here, under Judge Estudillo's watchful eye, the prosecuting attorney asked whether any member of the venire had strong feelings about border security.[6] Few jurors responded to the following inquiry:

> MR. DANO: . . . So the first question, just a general question. Some people say—some people say right now in our society that there's—a general question, that's what this question is, that we—a big topic of conversation going on in the country is border security. And I'm doing this to try to get a discussion going. Some people believe that we have not enough border security, need more, need more, a wall built, need more people on the border to protect our border. Some people are of the mind that we have more than enough, and that we've got plenty, that that's not a problem.
>
> So I'm asking you, which—between those two positions, which one are you closer to? First of all, who believes or who feels they're closer to the position that we need more border security than we currently have? Okay. That's about half the group.
>
> And people that are closer to the idea that we already have enough, we don't need more? Okay.

Rep. of Proc. (RP) at 270-71.

---

[6] The dissent agrees that the State's discussion of Colin Kaepernick was inappropriate and certainly an attempt to influence the actions or attitudes of the venire. However, Mr. Skone does not assert any resulting prejudice from the discussion.

Unlike Mr. Zamora, who was prosecuted for assaulting two officers, here, the

State's minimal questioning about border security bore some relevance. The State

anticipated evidence would be admitted of the two gangs commonly known to have ties

to cross-border criminality.

Even assuming the questioning lacked any relevance to the evidence, unlike

*Zamora*, Mr. Skone fails to assert the limited questioning resulted in actual and

substantial prejudice. Importantly, Judge Estudillo, as an objective observer, was in a

superior position to gauge any potential prejudice from the questioning. Unlike the trial

court in *Zamora*, Judge Estudillo did not allow the State unhindered questioning about

border security. Rather, Judge Estudillo carefully crafted parameters to the State's

questions about border security. CrR 6.4(b) governs voir dire and provides:

> (b) Voir Dire. A voir dire examination shall be conducted for the
> purpose of discovering any basis for challenge for cause and for the
> purpose of gaining knowledge to enable an intelligent exercise of
> peremptory challenges. . . . The judge and counsel may then ask the
> prospective jurors questions touching their qualifications to serve as jurors
> in the case, *subject to the supervision of the court as appropriate to the
> facts of the case*.

(Emphasis added) (boldface omitted). Judge Estudillo appropriately applied

CrR 6.4(b). He was aware that allegations of gang affiliation could invoke racial

or ethnic bias and proactively set boundaries to prevent such an occurrence.

Deference should be given to an experienced trial court judge who is clearly aware

of implicit, institutional, and unconscious biases. *Zamora* is procedurally and

5

factually distinguishable and should not "dominate[ ] the outcome of Zachary

Skone's personal restraint petition."  Majority at 28.

PRP STANDARD OF REVIEW

The majority creates a new right to automatic reversal for personal restraint

petitioners who fail to make the requisite showing of actual and substantial prejudice.

Precedent is clear, in the context of a PRP, a constitutional error will only merit relief if

the error also results in "actual and substantial" prejudice.  *In re Pers. Restraint of Cook*,

114 Wn.2d 802, 810, 792 P.2d 506 (1990); *In re Pers. Restraint of Hagler*, 97 Wn.2d

818, 825, 650 P.2d 1103 (1982).  In contrast to direct appeal, where the State bears the

burden of showing that constitutional error is harmless beyond a reasonable doubt, a

personal restraint petitioner bears the burden of demonstrating that, more likely than not,

he or she was prejudiced by the error.  *In re Pers. Restraint of Brockie*, 178 Wn.2d 532,

539, 309 P.3d 498 (2013).  "[S]peculation, conjecture, or inadmissible hearsay" will not

suffice.  *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

The same rule applies to constitutional errors that would be considered per se

prejudicial on direct appeal.  "[W]e decline to adopt any rule which would categorically

equate per se prejudice on collateral review with per se prejudice on direct review."  *In re*

*Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992).  Recently, the

Washington State Supreme Court reaffirmed *St. Pierre* when it held that public trial

violations, which are considered structural error on direct appeal, require proof of actual

and substantial prejudice when raised for the first time in a personal restraint petition. *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 329, 394 P.3d 367 (2017).

The Court of Appeals is bound by decisions of the Washington State Supreme Court. *State v. Gore*, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984). Because we are bound by *St. Pierre*, *Rhem*, and related cases, Mr. Skone is required to show by a preponderance of the evidence that he was prejudiced by the alleged error before we can grant him relief.

The majority seeks to disregard this binding precedent on the grounds that the Supreme Court has not applied it to this particular error. Majority at 44. Such a conclusion is irrelevant. *St. Pierre*, and the cases that have since reaffirmed *St. Pierre*, leave no such opening. If such an opening were to exist, it is for the Supreme Court to fill, not this court. *State v. Jones*, 159 Wn.2d 231, 239 n.7, 149 P.3d 636 (2006) (It is the Supreme Court's prerogative alone to reject a prior holding.); *State v. Griepsma*, 25 Wn. App. 2d 814, 817-18, 525 P.3d 623 (2023) (The Court of Appeals may not disregard Washington Supreme Court precedent just because the parties believe the court would now overrule that precedent.).

The majority also tries to disregard this binding precedent by citing to a few outlier PRP decisions wherein the Supreme Court has not inquired into prejudice because the prejudice was plain on the face of the error. Majority at 47-48. Yet, the majority does not claim that this is a case in which prejudice is plain on the face of the error.

7

Rather, the majority simply rushes to the conclusion that "the voir dire questioning inserted ethnic bias into the proceeding" and, therefore, "breached the right to an impartial and fair trial." Majority at 66. The majority reaches this outcome while simultaneously acknowledging that "Skone does not address the question of prejudice.

Moreover, the Supreme Court has repeatedly reaffirmed the need for a distinction between appeals and collateral attacks. "Personal restraint petitions are not a substitute for appeals." *Haverty*, 101 Wn.2d at 504. "[W]e have recognized that a PRP cannot be allowed to deteriorate into a writ of appeal, allowing a petitioner to institute appeal after appeal." *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 686, 717 P.2d 755 (1986). "[C]ollateral relief undermines the principles of finality of litigation, degrades the prominence of the trial, and sometimes costs society the right to punish admitted offenders. These are significant costs which require that collateral relief be limited." *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 86, 660 P.2d 263 (1983).

The majority recognizes some of this case law. Majority at 47-48. But, the majority dispenses with it by claiming "[c]oncerns for finality of judgments lack force when a person might be innocent." Majority at 51. Yet, the majority cites no authority for this bold new proposition of law. To the contrary, a claim of innocence has never been held by our Supreme Court to be a magic talisman entitling a petitioner to bypass all procedural rules. To date, Washington has neither recognized, nor rejected, the ability to raise claimed innocence as a basis for bypassing well-established procedural rules. *In re*

8

*Pers. Restraint of Weber*, 175 Wn.2d 247, 262, 284 P.3d 734 (2012). But, if such a claim were ever to be recognized, the Supreme Court has held that, at a minimum, the petitioner would be "required to show that in light of new evidence 'it is more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt.'" *Id.* at 258 (alteration in original) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)). Thus, even petitioners claiming innocence still bear a heavy burden on collateral review. This discussion of innocence is neither here nor there because Mr. Skone's petition does not claim actual innocence. Mr. Skone merely claims that he did not receive a fair jury selection process. In short, this is not the case in which to test whether possible/probable/actual innocence is a basis for bypassing our well-established rules promoting finality.

The majority's conclusion, "that we have followed the recent precedent of *State v. Bagby*,[7] *Henderson v. Thompson*,[8] *State v. Zamora*, *State v. Berhe*,[9] and GR 37 and the earlier United States Supreme Court precedent of *Vasquez v. Hillery*[10]" highlights the point. Majority at 70. Unlike Mr. Skone, in each criminal case cited by the majority the defendant is a member of a cognizable racial or ethnic group. In the sole civil case cited by the majority, Ms. Henderson is Black. The majority's reliance on GR 37 is, at

---

[7] 200 Wn.2d 777, 794, 522 P.3d 982 (2023) (plurality opinion).
[8] 200 Wn.2d 417, 432, 518 P.3d 1011 (2022).
[9] 193 Wn.2d at 665.
[10] 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986).

best, dubious as the policy and purpose of that general rule "is to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). Here, no potential jurors were excluded based on race or ethnicity.

PUBLIC POLICY

Even if this court were free to extend *Zamora*'s rule of automatic reversal on direct appeal to collateral attacks, public policy admonishes against doing so. First, it must be remembered that *Zamora*'s rule of automatic reversal on direct appeal is not constitutionally mandated. The federal constitution guarantees a fair trial. But, the Constitution is completely silent on what errors render a trial unfair, whether or not a defendant must be harmed by an unfair trial in order to merit relief, or even whether a new trial is the proper remedy for an unfair trial. Instead, courts have stepped in to fill those gaps based on the judges' and justices' views of what constitutes good public policy.

In *Zamora*, Washington's Supreme Court expressly abandoned a prior policy decision it had made that applied the constitutional harmless error standard to "race-based misconduct" by prosecutors when raised for the first time on direct appeal. 199 Wn.2d at 721. The Supreme Court decided to replace the constitutional harmless error standard with automatic reversal because its "past effort to address race-based prosecutorial misconduct by applying a harmless error standard has proved insufficient to deter such conduct." *Id*. at 722. The high court decorously decided that its racial justice efforts

10

were lacking effectiveness and that by further pressuring prosecutors, it could gain better compliance more quickly.

The Supreme Court's policy goals are not only laudable, they are long overdue. The Civil War ended 158 years ago, and yet we still have not achieved real and lasting racial justice in society, in employment, in education, in policing, in elections, or in the courts—to name just a few institutions in which racial injustice persists. When our racial justice efforts fail or prove insufficient, we are mandated to change tactics. But, we must do so prudently.

A means that may prove effective in one instance, may not be effective in another. Or, while effective, the side effects may outweigh the benefit. Just as some medications are not appropriate for all patients in all contexts, automatic reversal is not appropriate for all allegations of race-based misconduct in all forums, especially when, as here, the petitioner is not a member of a historically marginalized group. Automatic reversal's therapeutic window is narrow and especially narrow in the PRP context.

The United States Supreme Court has repeatedly recognized this fact, first in *Chapman v. California*, when it held that prosecutorial misconduct is not subject to automatic reversal. 386 U.S. 18, 23-26, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The Court recognized it again when it held "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Addonizio*, 442 U.S. 178, 184, 99 S. Ct. 2235, 60 L. Ed. 2d 805 (1979)). The Court

recognized it again when it reaffirmed that confrontation clause errors do not merit

automatic reversal: "'Reversal for error, regardless of its effect on the judgment,

encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'"

*Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)

(quoting ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 50 (1970)).  The Court

recognized it again in *Rose v. Clark*, 478 U.S. 570, 579, 106 S. Ct. 3101, 92 L. Ed. 2d

460 (1986) (quoting *Van Arsdall*, 475 U.S. at 681), when it once more reiterated that the

right to a fair trial is not a right to a perfect trial:

> The thrust of the many constitutional rules governing the conduct of
> criminal trials is to ensure that those trials lead to fair and correct
> judgments.  Where a reviewing court can find that the record developed
> at trial establishes guilt beyond a reasonable doubt, the interest in fairness
> has been satisfied and the judgment should be affirmed.  As we have
> repeatedly stated, "the Constitution entitles a criminal defendant to a fair
> trial, not a perfect one."

The Court recognized it again when it held in another habeas case that a "'[s]tate

is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation

that the defendant was prejudiced by trial error; the court must find that the defendant

was actually prejudiced by the error.'"  *Davis v. Ayala*, 576 U.S. 257, 268, 135 S. Ct.

2187, 192 L. Ed. 2d 323 (2015) (second and third alteration in original) (quoting

*Calderon v. Coleman*, 525 U.S. 141, 146, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998) (per

curiam)).  In *Weaver v. Massachusetts*, the Court yet again recognized it when it held that

criminal defendants bear the burden of proving prejudice in postconviction proceedings

claiming violation of the public trial right. 582 U.S. 286, 302-03, 137 S. Ct. 1899, 198 L. Ed. 2d 420 (2017). Although public trial violations are typically subject to automatic reversal when properly preserved and raised on direct appeal, the policy justifications for automatic reversal wane when the error is raised for the first time in the present context:

> [T]he trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure.
>
> Furthermore, when state or federal courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent. That is because, if a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost. There are also advantages of direct judicial supervision. Reviewing courts, in the regular course of the appellate process, can give instruction to the trial courts in a familiar context that allows for elaboration of the relevant principles based on review of an adequate record. . . .
>
> When [a new] claim is raised in postconviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases. The finality interest is more at risk, . . . and direct review often has given at least one opportunity for an appellate review of trial proceedings. These differences justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised [later].

*Id.* (citation omitted).

For decades, it has been understood that automatic reversal without proof of prejudice is generally not appropriate in collateral proceedings, and is rarely appropriate on direct appeal. As the decades have progressed, the policy justifications that counsel against automatic reversal on collateral review have only become stronger, as we have

begun to consider the harm that reversal without prejudice causes to others and society as a whole.

But, "[i]n its haste to create a novel [procedural] right, the court wholly failed to take into account the interest of the victim of these crimes in not undergoing the ordeal of yet [another] trial." *Morris v. Slappy*, 461 U.S. 1, 14, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983). Trial and retrial come with a human toll that courts have ignored for too long. The following examples are presented to cultivate caution and thoughtful consideration of how we can achieve justice while simultaneously striving toward the highest social utility (i.e., not needlessly harming others when one convicted of a crime has already received a fair, but imperfect, trial).

In 2013 a sex abuse victim committed suicide days after testifying in court.[11] In 1987 a defense investigator killed himself hours after testifying in a horrific case.[12] In 1998 a prosecution witness tried to kill himself to avoid having to testify in court.[13] In

---

[11] Helen Pidd et al., *Sexual Abuse Victim's Suicide Sparks Call for Review of Court Procedures*, GUARDIAN (Feb. 9, 2013, 5:37 AM), https://www.theguardian.com/uk/2013/feb/09/frances-andrade-courts-son [https://perma.cc/TU54-H49E].

[12] Michael D. Harris, *McMartin Witness Commits Suicide*, UPI (Dec. 11, 1987), https://www.upi.com/Archives/1987/12/11/McMartin-witness-commits-suicide/6661566197200/ [https://perma.cc/Y5AP-PBRS].

[13] Christina Carrega-Woodby, *Prosecutors' Witness Tried to Kill Himself to Avoid Taking Stand for 1993 Murder Trial, Court Records Show*, N.Y. DAILY NEWS (last updated Apr. 8, 2018, 4:41 PM), https://www.nydailynews.com/2016/10/05/exclusive-prosecutors-witness-tried-to-kill-himself-to-avoid-taking-stand-for-1993-murder-trial-court-records-show/&sca_esv= 584661508&hl=en&gl=us&strip=1&vwsrc=0.

No. 39087-0-III
*In re Pers. Restraint of Skone* (Dissent)

2007 a criminal defendant attempted to kill himself before facing what was to be arduous

cross-examination by prosecutors in court the next day.[14]  In 2016 a juror committed

suicide two days after a grueling case ended in a mistrial.[15]  In 2018 a superior court

judge in this state abruptly left the courthouse in the middle of trial, drove to a bridge,

and was found pacing back and forth contemplating whether to jump to his death.[16]

These are extreme examples.  Far more common is the experience of Mark Farrant, a

man who was diagnosed with posttraumatic stress disorder (PTSD) after serving as a

juror in a 2014 trial and who was still suffering years later.[17]  When an appellate court

orders a retrial as a remedy for a legal error, the court needs to consider not just the

interests of the defendant, but the interests of everyone involved.

In 1989 Washington adopted its 84th amendment to the state constitution.  The

amendment created a new section, article I, section 35, enshrining crime victims' rights in

---

[14] *Higgs Attempts Suicide after Testifying*, NEV. APPEAL (June 26, 2007), https://www.nevadaappeal.com/news/2007/jun/26/higgs-attempts-suicide-after-testifying/ [https://perma.cc/4E89-S7N2].
[15] *Juror Suicide Brings Call for More Caution in Trials with Graphic Evidence*, NAT'L POST (Can.) (Dec. 16, 2016), https://nationalpost.com/news/canada/juror-suicide-brings-call-for-more-caution-in-trials-with-graphic-evidence [https://perma.cc/NBD5-URV4].
[16] Kristin M. Kraemer, *A Judge Talked of Whether 'To Live or Not': State Troopers Found Him on This I-82 Bridge*, Tri-Cities Herald (Wash.) (last updated Sept. 30, 2018, 10:38 AM), https://www.tri-cityherald.com/news/local/article218765295.html.
[17] Michelle Cheung, *Ex-Juror Diagnosed with PTSD Says Psychiatric Help Should Be Available After Trials*, CBC NEWS (Can.) (Oct. 12, 2016, 5:00 AM), https://www.cbc.ca/news/canada/toronto/jury-murder-trials-justice-court-ontario-ptsd-trauma-1.3796520 [https://perma.cc/93NR-TZZW].

the constitution. The substantive provisions of the amendment have no application here, but the amendment is still important as a statement of policy. The amendment was adopted to "accord [crime victims] due dignity and respect." WASH. CONST. art. I, § 35. The people of this state understood that "[e]ffective law enforcement depends on cooperation from victims of crime" and one way to ensure continued cooperation is to be respectful to crime victims and be cognizant of the hardships they face just by participating in the criminal justice system. *Id.*

Long before Washington enshrined victims' rights in the state constitution, the United States Supreme Court recognized that crime victims have rights that courts should protect no less vigorously than the courts protect the rights of criminal defendants. "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament." *Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S. Ct. 330, 78 L. Ed. 674 (1934). Over the decades, the Supreme Court has repeatedly reaffirmed this policy. *E.g.*, *Morris*, 461 U.S. at 14 ("[I]n the administration of criminal justice, courts may not ignore the concerns of victims."); *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991).

In 1981 the legislature followed suit by codifying rights for crime victims, survivors, and witnesses. *See* chapters 7.69-7.69B RCW. The legislature expressed, in part:

16

> In recognition of the severe and detrimental impact of crime on victims, survivors of victims, and witnesses of crime . . . the legislature declares its intent, in this chapter, to grant to the victims of crime and the survivors of such victims a significant role in the criminal justice system. The legislature further intends to ensure that all victims and witnesses of crime are treated with dignity, respect, courtesy, and sensitivity; and *that the rights extended in this chapter to victims, survivors of victims, and witnesses of crime are honored and protected by . . . judges in a manner no less vigorous than the protections afforded criminal defendants.*

RCW 7.69.010 (emphasis added). Relevant to the matter before us, "[t]he legislature recognizes that witnesses are often fearful of testifying against criminal gang members. Witnesses may be subject to harassment, intimidation, and threats." RCW 7.69.035. In this case, those concerns were founded—Mr. Skone was convicted of attempting to bribe a witness.

A policy of automatic reversal and retrial for harmless errors fails to accord crime victims with "due dignity and respect" and instead strains fairness to a filament. For decades, we have known that high percentages of crimes go unreported due in part to the trauma victims fear they will be put through by participating in the criminal justice system. The revictimization that survivors suffer as a part of their participation in the criminal justice system is so well established that it even has its own name: "second rape" or "re-rape," depending on the nature of the offense. *See, e.g.*, Megan Reidy, *The Impact of Media Coverage on Rape Shield Laws in High-Profile Cases: Is the Victim Receiving a "Fair Trial"?*, 54 CATH. U. L. REV. 297, 309, 309 n.70 (2004).

17

Revictimization by the court system is not a rhetorical exaggeration.  In a study

that looked at the effect that testifying had on victims' mental health recovery, the

victims who had testified more than once had worse long-term mental health outcomes

than those who testified only once or who did not testify at all.  Myriam Hany Elmi et al.,

*Child Sexual Abuse Victims as Witnesses: The Influence of Testifying on Their Recovery*,

86 CHILD ABUSE & NEGLECT 22, 29 (2018); *see also* Dorislee Gilbert & Emily Bonistall

Postel, *Truth Without Trauma: Reducing Re-Traumatization Throughout the Justice

System*, 60 UNIV. OF LOUISVILLE L. REV. 523 (2022); Negar Katirai, *Retraumatized in

Court*, 62 ARIZ. L. REV. 81 (2020).

The Supreme Court recognized the magnitude of this problem in *Morris* and the

people of this state recognized it when they adopted article I, section 35 of the

Washington State Constitution.  *Morris*, 461 U.S. at 14-15.  A policy of dignity, respect,

and bilateral fairness cannot be reconciled with a policy that would subject innocent

victims to further trauma in the name of sending a message to prosecutors.  We cannot

expect those who have suffered at the hands of a criminal to protect others by

participating in the justice system when the criminal justice system has a reputation for

needlessly revictimizing these individuals.

The criminal justice system's victimization and revictimization of trauma

survivors does not end with crime victims.  A review of prior studies involving jurors

found that a majority of jurors studied experienced PTSD-like symptoms following jury

duty.  Michelle Lonergan et al., *Prevalence and Severity of Trauma- and Stressor-Related Symptoms among Jurors: A Review*, 47 J. OF CRIM. JUSTICE 51, 53, 59 (2016).  In all, these studies surveyed close to 3,000 jurors.  *Id*. at 55.  The overwhelming majority of respondents served on murder and other violent trials; a small fraction of respondents served on civil or minor criminal matters.  *Id*.  Some studies surveyed respondents immediately after trial and followed-up weeks and months later; other studies surveyed respondents years and even decades after trial.  *Id*.

Many of these jurors' symptoms met the diagnostic criteria for PTSD, acute stress disorder, adjustment disorder, and other mental health disorders.  *Id*. at 52-53, 57.  While it is a minority of jurors, an alarming number experienced long-term symptoms.  *Id*. at 53, 55.  In the studies reviewed by Lonergan et al., between 14 percent and 56 percent of former jurors believed that "jury duty would cause emotional problems in most people." *Id*. at 54.[18]  Notably, jurors are more likely to record their fellow jurors as being stressed than to admit being stressed themselves.  Noelle Robertson et al., *Vicarious Traumatisation as a Consequence of Jury Service*, 48 HOWARD J. OF CRIME & JUST. 1,

---

[18] These percentages may also reflect an undercount.  All social scientific studies have limitations.  One critical limitation is individual participant insight.  When surveys are open-ended, respondents with limited insight into mental health may give inaccurate answers: "For example, if an individual does not make the connection between work-related stressors and interpersonal difficulties, then he or she will not provide that as an example of a [vicarious trauma] symptom."  Peter G. Jaffe et al., *Vicarious Trauma in Judges: The Personal Challenge of Dispensing Justice*, 54 JUV. AND FAM. CT. J. 1, 7 (2003).

4-5 (2009). Thus, even jurors who may not personally experience clinically significant

stress connected to jury duty (or who fail to recognize their own symptoms) acknowledge

that jury duty is likely to cause emotional problems for other jurors.[19]

In a survey of vicarious trauma in attorneys, mental health providers, and social

workers, "attorneys experienced more symptoms of secondary trauma and burnout

compared with both comparison groups [mental health providers and social workers]."

Andrew P. Levin & Scott Greisberg, *Vicarious Trauma in Attorneys*, 24 PACE L. REV.

245, 250 (2003). "[T]he attorneys were consistently higher on each of the subscales of

secondary trauma." *Id*. Similar to the judges, client confidentiality concerns also appear

to prevent attorneys from effectively utilizing debriefing and consultation as coping

strategies. *Id*. at 251 ("[T]hey attributed their secondary trauma responses to . . . lack of a

regular forum to discuss and ventilate regarding their own feelings.").

In a study of trauma in judges, 63 percent of respondents reported one or more

short- or long-term symptoms of vicarious trauma. Peter G. Jaffe et al., *Vicarious*

*Trauma in Judges: The Personal Challenge of Dispensing Justice*, 54 JUV. & FAM. CT. J.

1, 4 (2003). The most prevalent symptoms included sleep disturbances, intolerance of

---

[19] A majority of jurors report being proud of their jury service and a smaller majority would volunteer to do it again. Lonergan et al., *supra*, at 54. These responses are encouraging. But, for too long, we have ignored the sizeable minority of jurors who come away from the experience literally traumatized, meeting the diagnostic criteria for one or more mental illnesses.

others, physical symptoms, depression, and a sense of isolation. *Id*. "Judges with more [years of] experience also reported a significantly greater number of symptoms than those with less experience." *Id*. The judges who had been on the bench longer were also more likely to manifest externalized symptoms, including: anger, frustration, irritability, cynicism, and intolerance of others. *Id*. at 4-5. Thus, judges' traumas have a negative ripple effect on cases involving other parties and other attorneys. The very nature of judging (handling sensitive information in a confidential setting and the ethical duty to remain independent) often prevents judges from effectively utilizing some of the best tools for coping with trauma: debriefing and consultation. *Id*. at 6.

In another study of vicarious trauma in judges, the researchers ended by asking the judges, "Is it worth it?" Dawn E. McQuiston et al., *Vicarious Trauma in the Courtroom: Judicial Perceptions of Juror Distress*, 58 JUDGES' J. 32, 35 (2019). The judges "responded with a unanimous and enthusiastic 'no.'" *Id*. For all the good that the jury system does, the short-term and long-term psychological and emotional harm that it causes to almost every single person in the courtroom was viewed by these study participants to not outweigh the good achieved by the jury system. *Id*.

For over a decade, Washington's Supreme Court has been hastening the implementation of racial justice measures. *E.g.*, *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011); *State v. Saintcalle*, 178 Wn.2d 34, 309 P.3d 326 (2013), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017);

21

No. 39087-0-III
*In re Pers. Restraint of Skone* (Dissent)

*State v. Jefferson*, 192 Wn.2d 225, 429 P.3d 467 (2018); *Zamora*, 199 Wn.2d 698.

Again, the Supreme Court's goals are of exceptional importance. We are still too far

from the achieving the promises made in the Reconstruction amendments.[20] However, as

we embark on a new vision of racial justice, we must do so with a full awareness of our

surroundings.

Even in light of the legislature's directive that "rights extended in this chapter to

victims, survivors of victims, and witnesses of crime are honored and protected by . . .

judges in a manner no less vigorous than the protections afforded criminal defendants,"

RCW 7.69.010, to date, not a single modern racial justice opinion in the Evergreen State

has considered the impact reversal will have on anyone other than criminal defendants.

This glaring omission persists while racial and ethnic minorities continue to be

disproportionately overrepresented as victims of violent crime.[21]

In this case, Zachary Skone, who was precluded from possessing a firearm,

admittedly shot Dane Alexander. Mr. Alexander was shot six times and left for dead, yet

managed to survive at the expense of over $100,000 worth of life-saving medical

treatment. The shooting required removal of his spleen, damaged his pancreas, damaged

---

[20] This phrase is sometimes used to refer to United States Constitution amendments XIII, XIV, and XV.

[21] ALEXANDRA THOMPSON & SUSANNAH N. TAPP, U.S. DEP'T OF JUST., CRIMINAL VICTIMIZATION, 2022, at 16 (Sept. 2023), https://bjs.ojp.gov/document/cv22.pdf [https://perma.cc/L49U-CHNM].

his intestines, and left him with partial paralysis that he will suffer from for the rest of his

life. To this day, one bullet remains lodged in his body because removing it risks further

injury. Mr. Alexander should not be forced to yet again vividly recall the trauma

inflicted on him unless absolutely necessary.

Not only are victims, survivors, and witnesses excluded from consideration, the

courts have failed to contemplate the effect reversal has on judges, prosecutors, defense

lawyers, law enforcement officials, bailiffs, judicial assistants, court reporters, victim

advocates, lawyers and litigants in other cases. It can be argued that most of these

individuals signed up for this work and repeat exposure to trauma is just part of the

job[22]—but not victims, witnesses, and jurors.

No person volunteers to suffer the trauma that crime victims, happenstance

witnesses, and jurors experience. Even in cases *without traumatic facts*, jurors, who earn

between $10 and $25 per day,[23] report experiencing trauma symptoms months and even

years after trial. The adversarial trial system itself generates trauma and measurably

harms participants. Sequestration, fear of reprisal (not just from the parties but also from

---

[22] It is doubtful any person entering one of the many criminal- and civil-justice related professions enters with a real conscious understanding of the trauma they will be exposed to and will themselves experience.

[23] RCW 2.36.150(2).

23

the juror's friends and family),[24] being called to decide someone's guilt or liability, to decide who (if anyone) is telling the truth,[25] and to argue and deliberate with one's fellow jurors have all been linked to subsequent trauma symptoms. *See* Lonergan et al., *supra*, at 54. Thus, not only do jurors suffer secondary trauma, but they also experience a new primary trauma. In several studies, primary trauma caused by jury deliberations had a higher association with long-term symptoms, than secondary trauma from exposure to graphic material. *Id*. at 51-61 (discussing D.W. Shuman et al., *The Health Effects of Jury Service*, 18 LAW & PSYCHOLOGY REV. 267 (1994); L. D. Bertrand & J. J. Paetsch, *Juror Stress Debriefing: A Review of the Literature and an Evaluation of a Yukon Program*, Yukon Dep't of Just. (2008)). It is the jury system itself that is traumatizing, not just the traumatic subject matter. While studies have proved this to be true, judges appear to be largely oblivious to this fact and instead focus solely on the harm caused by trauma-inducing evidence. *See* Robertson, *supra*, at 5 (judges "failed to identify the widespread

---

[24] Here, during trial, juror 5 expressed concern about gang-related retaliation against the jurors if the jury found Zachary Skone guilty. Other jurors also expressed this concern.

[25] The Supreme Court pretends that jurors are not asked to decide fact and fiction, truth and falsity—that their sole job is to decide whether the parties have met their respective burdens of proof. "The jury's job is not to determine the truth of what happened; a jury therefore does not 'speak the truth' or 'declare the truth.' Rather, a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012) (citation omitted). Make no mistake, jurors believe that they are called on to determine fact and fiction by virtue of being asked to weigh witness credibility and return a verdict. No admonitions and claims to the contrary will change that perception.

concern among jurors over the deliberative process and instead, singled out type of trial

(child abuse; murder) as the principal cause" of trauma).

When a criminal defendant has received a fair, albeit imperfect, trial, it is an abuse

of power to order a new trial given what we now know about trauma. Ordering more

people to reexperience trauma and to experience new trauma merely to send a message to

prosecutors creates an indecorous result. Washington's appellate judiciary must begin to

consider the human cost of retrial.

One may wonder then, whether our only choices are to harm others or forego the

promise of racial justice. The answer is no; other options exist. Although *Zamora*

certainly warranted reversal, following the Supreme Court's opinion, the Washington

State Bar Association (WSBA) opened a disciplinary investigation into the involved

prosecuting attorney and subsequently disciplined him.[26] Had the Supreme Court

affirmed Mr. Zamora's convictions, WSBA's disciplinary apparatus could have

still intervened to correct that attorney's ethical violation. Surely, not all professional

discipline need be punitive. Likewise, if the Supreme Court sees a disturbing trend in

lawyers' conduct, it can task one of its many standing committees to develop new court

rules, training materials, or continuing legal education programs for lawyers. The

Supreme Court could make such targeted programs mandatory, as it did last year

---

[26] Https://www.mywsba.org/PersonifyEbusiness/Default.aspx?TabID=1541&dID=2374 [https://perma.cc/R9BY-289C].

when it made equity and inclusion programming mandatory for attorney relicensing. APR 11(c)(1)(ii).

When a criminal defendant has not received a fair trial, reversal for retrial is required. Despite the human toll of retrial, it is the only solution we have thus far devised for ameliorating such failures. But, as in this case, when the defendant has already received a fair trial, reversal is not appropriate when the sole purpose is to send a message to other court participants. There are other ways we can move racial justice forward without needlessly harming others. A criminal defendant "is entitled to a trial [that is] free of prejudicial error, not one that is totally error free." *State v. Evans*, 96 Wn.2d 1, 5, 633 P.2d 83 (1981).

Cooney, J.